PATRICK RYAN, Appellant, *v.* THE CITY OF NEW YORK, Respondent.

First Department, July 13, 1917.

Municipal corporations — action against city of New York by municipal contractor to recover damages for alleged delays, etc.— evidence not justifying recovery — assignment of sums due from city as collateral security for loan — effect of general release by assignee — estoppel — acceptance of partial payment by contractor without protest or reservation of claim — delay in making partial payment — interest — failure to claim interest when accepting payment — claim for sheet piling left in ground by order of engineer.

Action by the assignee of a municipal contractor brought against the city of New York to recover various items of damage alleged to have been caused to the contractor in performing the work by acts of the municipal authorities. Evidence examined, and

*Held,* that although the city's engineer countermanded instructions respecting the construction of a pipe gallery near the top of a wall to be built by

the contractor, the delay thereby caused did not entitle a recovery of damages for alleged interference with the construction of the lower portions of said wall, as the proof showed that the delay in determining the kind of pipe gallery to be constructed in no way interfered with the contractor's progress in building the underlying structure.

*Held, further,* that the judgment should be affirmed as to a claim or item for damages for alleged delay in the year 1906.

*It seems,* that the fact that the contractor assigned all sums due or to become due to a bank as security for loans made by it and the bank, on receiving moneys from the city, gave a written release for a specific item of alleged damage, while the printed portion of the instrument released the city " for any matter, cause or thing," the general words of release did not cover all the contractor's claims, for the assignment was made only as collateral security and the acts of the parties showed that they considered the release to the bank as a mere receipt and release of a specified item.

Where the contract provided for the use of two different qualities of cement, and the contractor, on the order of the city's engineer, used a larger proportion of the higher grade cement than originally contemplated without any protest whatever and subsequently accepted " progress payments " for a long period of time without any indication of a reserved claim, the city cannot subsequently be held liable for the increased value of the cement used.

The above rule holds as to a claim for installing electric wires of a larger gauge than those originally contemplated, where the contractor installed the same without protest or claim for damages.

*It seems,* that where the city failed to make progress payments when due, any interest which might become due to the contractor must be reckoned from thirty days after date of demand on the city comptroller and not from thirty days after the work was certified.

However, where on each progress payment the contractor gave to the comptroller a receipt " in full payment of claim " represented by the warrant, and made no reservation of a claim for additional interest, a recovery thereof is barred.

The contract provided that all sheet piling installed for temporary purposes should be removed by the contractor unless ordered left in place by the engineer, in which case the piling was to be paid for as permanent timber. The evidence showed that, owing to the nature of the bottom of the excavation, it was considered by the contractor and engineer necessary to leave certain sheet piling in place and that it became impossible to extract it after the concrete wall had been constructed. There was a conflict of evidence as to whether the city engineer had ordered said piling left in place. *Held,* that a finding by the jury in favor of the city on this issue was clearly against the weight of the evidence, in that the act of the city's engineer was tantamount to an order that the timber be left in the ground, and that a new trial of this claim should be ordered.

CLARKE, P. J., and DOWLING, J., dissented in part, with opinion.

APPEAL by the plaintiff, Patrick Ryan, from a judgment of the Supreme Court in his favor, entered in the office of the clerk of the county of New York on the 31st day of October, 1914, upon the verdict of a jury, and also from an order entered in said clerk's office on the 29th day of October, 1914, denying plaintiff's motion for a new trial as to the verdict for defendant on an item for sheeting and foundation timbers and to set aside the court's direction dismissing the complaint as to certain other items.

*John C. Wait* [*Howard G. Wilson* with him on the brief], for the appellant.

*E. Crosby Kindleberger,* for the respondent.

SHEARN, J.:

The contract was between plaintiff's assignor and the defendant for the construction of a public improvement, an extension of the Riverside Drive from the old viaduct over Manhattan valley (One Hundred and Thirty-fifth street) to One Hundred and Forty-fifth street. The contract was executed on or about December 7, 1903, and was fully performed. Concerning the items involved in the dismissal, the plaintiff complained that the work was needlessly delayed by the defendant, to the damage of plaintiff's assignor; that increased cost was imposed upon the contractor due to the substitution of Portland cement in place of Rosendale cement by order of defendant's engineer; and that the defendant wrongfully withheld moneys due on progress payments, entitling plaintiff to recover interest on such deferred payments. The damages for delay are grouped in three classes: (a) 1904; (b) 1906; and (c) 1907–8.

Taking up the 1904 delay, we find that the complaint alleges that during the performance of the work and for a period of two months and upwards including the month of July and parts of the months of June and August, 1904, the plaintiff's firm was wrongfully delayed in the progress of the work by the directions and unauthorized interference of the defendant, arising in part from uncertainty as to plans for the east wall with reference to pipe galleries. About March 1, 1904, the city's engineer had sent the contractor drawings

First Department, July, 1917.        [Vol. 179.

for the foundations of the east wall from One Hundred and Thirty-fifth to One Hundred and Thirty-eighth streets; but the engineer, after sending the letter, countermanded the instructions given because of uncertainty with respect to the installation of pipe galleries near the top of the east wall. Whether pipe galleries were to be constructed or not made no difference with the construction of the wall up to that point, but of course the contractor required plans for the foundation work up to that point. The plaintiff introduced a letter written by Engineer Williamson on May 20, 1904, in which reference was made to the plans for the east wall and conferences had respecting the possible use of pipe galleries near the top of the wall, in which the engineer wrote:

" However, I propose to build the sewer on the wall in any case, so that you are safe in going ahead with the wall up to the bottom of the sewer. Above this level there will be some difference when we know whether to construct a pipe gallery or not. You are, therefore, authorized to go ahead with the east retaining wall as shown on the above mentioned plans, up to the bottom of the sewer."

Small, the engineer of plaintiff's assignor, testified that when the east wall had been finished up to the bottom pipe gallery the work was stopped for two months, awaiting the city's decision as to the pipe galleries, and that this delay was damaging because it prevented the contractor from dumping and filling along the east wall excavated material required to be taken from other parts of the job, thus affecting several portions of the entire work as well as the work of building the east wall. Small testified that the wall was built up to the bottom of the sewer in the latter part of June or early in July, 1904, when the contractor had to stop for about two months. Later he corrected this testimony: " I say some time in August it probably reached this height, but I am not willing to say that it reached it on the 20th of August or the 3rd of September, or any particular definite time during that period. Q. But it did not reach that stage any time in July? A. I would say no." The documentary evidence shows clearly that no *concrete* work had been done in this foundation up to August 5, 1904, yet the work called for a three-foot slab of concrete under the east wall. Assuming that the con-

tractor was actually prevented from beginning the foundation work for the east wall until the letter of May 20, 1904, at which time concededly the contractor had the plans showing the work up to the bottom of the pipe gallery level, no delay could fairly be charged to stoppage of work *after the pipe gallery level was reached* in view of the fact that the contractor did not even lay the bottom concrete layer until August, 1904. If the contractor had brought the work up to the pipe gallery level by the first of July and had then been stopped for two months, it would be easy to see a fair basis for the claim of prejudicial delay, but, clearly, uncertainty in August over the pipe gallery level near the top of the wall could not be a basis for a claim of two months' delay in June, July and the early part of August of the same year, when the contractor had not up to the first week in August laid the concrete at the very base of the foundation wall. It is argued that the contractor could not proceed expeditiously with the foundation wall because the plans were withdrawn. The contractor, however, knew that the only change contemplated was with reference to that part of the wall near the top and had tracings of the plans that, according to the testimony of Andrew M. Parker, a member of the contracting firm, made it possible to proceed with the work up to the pipe gallery level. With reference to the alleged delay of two months in June, July and the early part of August, 1904, the learned trial justice was clearly right in dismissing the complaint upon the ground assigned, namely, that " plaintiff has not only failed to show that there was delay, but he has failed to show that the whole of the delay was caused through no act of his own and through the act of the defendant. The evidence, to my mind, shows that the work proceeded and could have proceeded with the plans which were received, and I am taking the testimony of the witness Parker as my guide in this matter."

1906 delay. The complaint alleges that by the directions and unauthorized interference of the defendant, its officers and engineers, the performance and completion of work on the east wall from One Hundred and Fortieth to One Hundred and Forty-second streets, by reason of a proposed change of plan, was delayed for a period of six months in the summer

of 1906, to the damage of plaintiff in the sum of $174,590.43. The total east wall ran for about ten blocks, or half a mile, and the stretch of the east wall involved in this claim between One Hundred and Fortieth and One Hundred and Forty-second streets, a distance of 460 feet, was about one-fifth of the length of the wall. On May 3, 1906, Mr. Williamson, the consulting engineer of the borough president, sent a letter to the contractor reading as follows:

" DEAR SIRS.— Going over your work this morning, I noticed that you have begun excavating for the east retaining wall between 140th and 142nd Streets.

" Inasmuch as plans are now before the Board of Estimate purposing to widen this part of the extension of Riverside Drive, I think it unwise to do any work at this point of your contract which may prove to be unnecessary if the changes are made.

" This is, therefore, to request you to .do nothing further in regard to the east wall between above mentioned streets until you hear further from me in regard to the matter."

On May 7, 1906, the secretary and treasurer of the Ryan-Parker Construction Company, which was then doing the work under the contract, wrote to Mr. Williamson an acknowledgment of this letter. No protest was made against the direction to suspend but it was suggested that, because of the delay entailed, additional moneys out of the retained percentages should be paid. Thereupon on the same day the consulting engineer acknowledged this letter and suggested that a formal letter be written to him which he could submit to the borough president. On May 9, 1906, the plaintiff, as president of the company, wrote to Mr. Williamson a letter stating that they were " at a loss how to proceed on our contract between 140th and 142nd Streets;" that they had in hand, on the ground and at the quarry, fabricated material of the value of $100,000, and " we therefore beg leave to request that you will present these matters to the President of the Borough of Manhattan, with a request that we be allowed at least $60,000 out of our retained percentage." On May 10, 1906, Mr. Williamson sent to the borough president a copy of this last letter and a letter of his own which read:

" The statements made in the letter from Messrs. Ryan

& Parker are correct, and contentions well founded. Plans have been prepared by your Engineer of Street Openings proposing to make a change in the easterly line of the drive from 139th to 142nd Streets. Upon this ground, I thought it well to hold back the contractors at this point, as there could be no advantage in doing the work twice over."

The work was suspended or stopped from May 3, 1906, until October 30, 1906, when the contractor received from Engineer Williamson the following order to proceed with the work:

" On May third last I requested you to do nothing further in regard to building the east wall between 140th and 142nd Streets.

" The reason for this request was as stated in that letter.

" However, as it seems doubtful when the proposed alterations contemplated between these streets will be carried into effect, and as I realize the hindrance to your contract, I believe that the best interest of the City will be served by no further delay.

" This is, therefore, to request you to proceed at once with your work between 140th and 142nd Streets and complete the same according to your contract plans."

There was fill to be put in at this point over a space of 120 to 130 feet and 500 feet long between the east and west walls. One side was to be filled to a depth of 15 feet and the other to a depth of 50 feet. When the contractor was allowed to proceed after October 30, 1906, he went ahead on the wall, but the winter weather and frozen ground interfered with the excavation and filling, and the fill was not completed until June, 1907. The claim of the plaintiff is that if the work had not been stopped in May, 1906, the east wall would have been completed that summer, the fill could have been placed in behind it, and having settled all during the winter of 1906–1907 it would have been compact enough to build the roadway of the drive in the spring of 1907. The plaintiff claims that not only was the completion of the entire work delayed for one year, thus tying up the contractor's retained percentage of $275,000 for that length of time, but that the contractor suffered other serious damage incident to the enforced idleness of parts of the plant.

Clause A of the contract provides that wherever the term " President " is used, " it shall refer to and mean the President of the Borough of Manhattan, or his authorized representative; * * * wherever the word ' Engineer ' is used, it refers to the Engineer appointed by the Borough President * * * to superintend and have charge of the work."

Clause K of the contract reads:

" (K). The President reserves the right of suspending the whole or any part of the work herein contracted to be done, if he shall deem it for the interest of the City so to do, without compensation to the contractor for such suspension other than extending the time for completing the work as much as it may have been, in the opinion of the President, delayed by such suspension."

The learned trial justice held that the delay in 1906 could not be made the basis of a recovery because the suspension was under the contract clause, the consulting engineer acting as the " authorized representative " of the borough president. The plaintiff contends that this letter of the consulting engineer was not a proper suspension order because it did not direct a suspension of the work but merely directed the contractor to stop the work until he received a further direction to proceed. There is no specified form of a suspension order. Plaintiff contends that under a suspension order the contractor is entitled to remove his material and plant and is able to use them in other places, whereas under a mere order to stop work until further orders the contractor is left in a position where he is compelled to await the orders of the engineers at any moment and must keep his force and plant ready to execute such orders. While there may be force in the distinction, each case must be decided according to its particular facts, and in the case at bar it is apparent that the contractor understood and treated the letter as an order of suspension. The fact that the contractor entered no protest against the delay entailed by the suspension is significant, for, assuming that the order was authorized, the contractor had no valid ground to protest as the contract permitted the work to be suspended in case the borough president deemed it for the interest of the city so to do without compensation for such suspension. The fact that no protest was forth-

coming until October clearly indicates that the contractor understood that the order was a suspension order within the provisions of the contract and that, therefore, a protest over the obvious delay entailed would be unavailing.

Plaintiff further contends that the engineer was not the authorized representative of the borough president for the purpose of determining whether it was deemed for the interest of the city to suspend the work under the contract. This contention is well founded. The important powers conferred upon the borough president were set forth in section 383 of the charter, which, as it existed at the time this contract was entered into and was being performed, provided who the authorized representative of the borough president should be, namely, the commissioner of public works of the borough. (Laws of 1901, chap. 466, § 383; amd. by Laws of 1907, chap. 383.) It is inconceivable that the broad power conferred upon the borough president of determining whether it was in the public interest that a contract for a great public improvement should be suspended or not could, in the absence of express statutory authorization, be delegated to or exercised by an engineer who was merely a subordinate in the department of the borough president. It is essential in the conduct of the business affairs of a great city that responsibility should be centered and fixed upon elected officials. The consequences of suspending work upon a great public improvement are bound to be serious and far reaching. While the borough president would undoubtedly attach great weight to the recommendations of his consulting engineer, so far as engineering questions were concerned, the actual determination of the question of public policy involved must be made by the borough president, except in such cases as the charter authorizes the duties to be performed by the commissioner of public works. Neither is it sufficient, as it is contended by the city, that the borough president may have known or approved of the act of his subordinate. The responsibility for a decision is his and can only be delegated as expressly authorized in the charter. But, the city further contends, the contractor accepted the suspension order and acted under it as though it were entirely valid and authorized, and, having failed to make any protest over the delay, cannot

now be heard to assert that the suspension order was invalid and ineffective so as to entitle the plaintiff to recover damages for the delay entailed. The contractor's failure to protest would be sufficient to bar recovery but for the fact that the contractor evidently assumed that the suspension order was valid, as claimed by the city, in which case there would be no use in protesting, at least until such time as the period of suspension became unreasonable. When October came and the suspension was still in effect the contractor apparently took legal advice and wrote a letter of protest. For failure to do so earlier, where the order of suspension, though unauthorized, was issued under such circumstances as to lead the city's counsel still to maintain that it was a valid order of suspension, the contractor should not be debarred from recovering such damages as he sustained by the unauthorized action of the consulting engineer.

Nevertheless, the city contends that there can be no recovery on this or any other item, because in 1907 the firm of Ryan & Parker assigned to the Oriental Bank " any and all sums of money now due or to grow due " upon the contract, and on January 18, 1909, the Oriental Bank, in acknowledging receipt of a payment of $800 in full amount retained by the city pending completion of work, not only released the city for this specific item, as *written* in the receipt or release, but also for any matter, cause or thing, as *printed* in the so-called release. This contention is not very creditable to the city. The assignment was merely by way of collateral security for loans made by the bank to Ryan & Parker, and a year later, February 21, 1910, the Oriental Bank assigned back to Ryan & Parker its rights to receive moneys due and to grow due under the contract. The city well knew and understood when it made the $800 payment that it was not settling this contract and was merely getting a quittance for the $800 item covered by the voucher number referred to in the so-called release. At the time this payment was made over $80,000 was still payable by the city, $2,378 of which was paid to the Oriental Bank on April 24, 1909, $75,000 of which was paid to the Oriental Bank on November 24, 1909, and $5,840 paid to Ryan & Parker on November 28, 1910. The parties by their acts construed this paper to be a mere receipt

and release of a specified item. The rule that where a release contains general words which are followed or preceded by a particular recital, the particular recital qualifies the general words, is peculiarly applicable where the general words are part of a printed form and the particular recital is written in.

The next claim involved is that growing out of the substitution of Portland cement for natural, American or Rosendale cement. The contract provided for the use of two different kinds or qualities of cement, section 38 of the specifications providing: "Natural cement and. Portland cement are to be used, as specified for the several portions of the work." In some cases the specifications for particular parts of the work specify the particular cement and in others do not. Clause A in the contract provides that the word " specified " means specified by the consulting engineer, and the city contends that the engineer had a perfect right to specify Portland cement for any part of the work for which no particular cement was definitely provided. This contention is sound so far as it goes, but does not cover all of the work, for instance, section 71 of the specifications providing that the stones shall be laid in American cement mortar. The change from Rosendale to Portland cement was made as a result of the following letter written by Engineer Williamson to the contractor:

"*June* 30, 1904.   *   *   *

" DEAR SIRS.— While the specification for your contract on the above work calls for the use of both natural and Portland cements in the mortar and concrete, I feel that, owing to the fact of the Rosendale cement now being used on Sections Three and Four of the Extension of Riverside Drive, not turning out. as satisfactory as it should, I shall be glad if you can arrange to use Portland cement of a standard quality only in your contract.

" Trusting that this will be satisfactory to you, I am."

It is very doubtful whether this letter was intended to be an order or direction, but, as the engineer habitually couched his directions in the form of polite requests, there is force in the plaintiff's contention that a question was raised for the jury as to whether this letter constituted an order or

direction, especially in view of the contractor's having accepted it as an order and acted upon it. But the item was properly dismissed by the learned trial justice. It appears that when Portland cement was used the proportion of cement and sand was one part cement and three parts sand, while, when the cheaper natural cement was employed the proportion was one part cement to two parts sand. Sand is cheaper than cement and if the contractor had at the time the request or order was made deemed it disadvantageous to comply, it is reasonable to assume that some complaint in writing would have been made or some oral protest proved. No attempt was made to prove any written protest and, although appellant's counsel insists that the court excluded an attempt to prove an oral protest, when the record is examined it discloses that the court merely ruled out a conversation between Mr. Parker and the borough president at a political convention in St. Louis, no suggestion being contained in the questions, some of which were leading, that the conversation related to any protest. Neither was the attention of the court directed to the purpose of the questions. Here the contractor accepted progress payments running over a long period of time and never made a suggestion, by way of presentation of a bill, reservation of claim or protest of any sort, indicating that there had been any loss or disadvantage or that the contractor had any claim growing out of complying with the engineer's request. It is highly important, especially in municipal contracts, that claims growing out of changes in the contract should be promptly asserted, so that the municipal authorities will know what a public work is costing as it goes along and not be subjected to large increases in cost based upon stale claims presented years after the event.

Coming to the item of 1907–1908 delay, it appears that on October 22, 1907, when the work was practically completed with the exception of laying the electric wires in the conduits, the engineer wrote to the contractor stating that he found " that the gauge of the wire must be increased and perhaps some other slight changes made in order to meet the present day requirements of the Department of Electricity." After some correspondence and on June 16, 1908, the original contract was modified by changing the specifications for the

wiring so as to conform to the requirements of the department of water supply, gas and electricity, and the contractor agreed to do this work " at the same cost as for the items in the original contract, namely, $6,530." Here again there was no protest and no claim for damages, and if there were any, the claim was silenced by the execution of a modification of the contract providing for the change at an agreed price. Later, a claim of over $16,000 damages turns up for alleged delay caused by this final item of some $6,000. As pointed out above, if a contractor wishes to protect himself from damages for delay growing out of a change, he must assert his claim at the time of the change and not lull the other party into a sense of security. When this modification was agreed to, the contractor knew full well that it would cause some delay and the opportunity for protecting himself was when he entered into the modification and fixed the sum that the city should pay for the modified work.

The next item involved in this appeal is interest on deferred progress or partial monthly payments. The contract provided in section KK that " in order to assist the contractor in carrying on the work and to facilitate its progress, partial payments will be made to the contractor by monthly installments of eighty-five per cent (85%) on the amount of work performed, and also on the quantity of materials furnished and delivered." In many cases the city failed to make these monthly payments and the contractor was compelled to wait for periods varying from a month and a half to seven months. Claim is made for interest on these monthly payments reckoning from thirty days after the work was certified until payment was made. If entitled to interest, however, the period should be reckoned from thirty days after the date of demand on the comptroller of the city. (*O' Keeffe* v. *City of New York*, 176 N. Y. 297.) When each progress payment was made, the contractor gave to the comptroller a receipt " in full payment of claim " represented by the warrant. There was no reservation made of an additional claim for interest, and this bars recovery. Plaintiff contends, however, that each progress payment was merely a payment on account of the entire contract and that the reservation of a claim for

interest when the final payment was made suffices to enable the plaintiff to recover in spite of the receipts in full given when the progress payments were made. It is quite true that the progress payments were merely payments on account, but under the contract they were full payments of all that the contractor was entitled to at the time, and the contractor's failure to make any protest at the time, coupled with a receipt in full, under the principle of protest above referred to, properly disentitles p aintiff to recover upon these items.

This brings us to the final claim involved in this appeal, namely, that the verdict of the jury as to the plaintiff's right to recover for excess quantity of wood sheeting used at the instance and with the full knowledge and approval of the city's engineer was against the weight of the evidence and contrary to the evidence. The contract called for the furnishing of two kinds of timber, the first designated throughout the testimony as item 27 or $40 sheeting, the second designated as item 28 or $150 sheeting, the latter being a special tongued and grooved sheeting twelve inches in thickness and running in width from ten to twelve inches, in length from 45 to 50 feet. The estimate required the contractor to furnish 100,000 feet of the $40 sheeting and 5,000 feet of the $150 sheeting. After the work was started, it was found that the ground was bad in many places, necessitating the use of larger amounts of sheeting. Nine hundred thousand feet of timber of both kinds was used. About 330,000 feet of timber was withdrawn and no claim is made for the sheeting withdrawn. The sheeting for which payment is demanded is that left in the ground on the alleged direction of the city's engineer. As to the $40 sheeting, only 105,000 feet was allowed in the final certificate. Section 21 of the specifications provided that "The price bid for excavation shall also include the work of * * * sheeting and bracing and supporting and maintaining all trenches and pits during and after excavation." Section 31 provided: "All sheeting and other timber work in trenches and pits, for bracing sheeting, scaffolding, and other temporary purposes shall be removed, unless ordered left in place by the engineer, in which case such timber will be paid for as heretofore stipulated for permanent timber work." Section 32 provided: " Sheet

piling may be ordered tongued and grooved, in which case it shall be furnished and placed as ordered by the engineer, and will be paid for as stipulated for tongued and grooved timber, driven and secured in place." It was decided between the contractor and the engineer that owing to the bad bottom in certain parts of the work, instead of excavating a slope away from the line of the trench, sheeting should be driven. This entailed the use of the excess quantity of timber. It was necessary to leave much of this timber in the ground, for it was impossible to extract it after the cement had been put in place without breaking off the timber. It was well understood between the contractor and the engineer that the contractor was to be paid for this timber, but when it appeared in the progress certificates in excess of the quantity specified in the estimate a representative of the comptroller refused to allow it, taking the technically correct position that the contractor was only entitled to be paid for timber actually ordered left in the ground. The contractor's engineer testified that the actual order was given by the engineer, but this was denied by the city's engineer. Plaintiff's counsel states in his brief that Engineer Williamson admitted on cross-examination that this $40 sheeting was directed to be left in place by him. Reference to the folios cited shows, as in several other cases, that the record does not bear out the citations. The issue of fact raised by this conflict was submitted to the jury, and the finding was clearly against the weight of the evidence. The city's engineer may have been correct in testifying that he did not in so many words tell the contractor to leave the timber in the ground, but when he directed the use of the timber with full knowledge that the necessities of the work involved leaving a substantial amount of the timber in the ground this was tantamount to ordering the timber to be left in the ground. As to the $150 sheeting, the evidence in favor of the plaintiff was still stronger, for there was introduced in evidence a sheet from the estimate book of Engineer Williamson's assistant Bryden containing the entry with respect to item 28, $150 sheet piling: " Total, 117,078 feet. Amount in certificates, 114,000 feet. Amount ordered left in, 117,000 feet." Furthermore, the testimony established without contradiction that the use of the sheeting

as arranged for by the city's engineer resulted in saving the city's money and it would be very inequitable to refuse the contractor payment for the timber in this state of the record.

It follows that the judgment in so far as appealed from should be affirmed as to items of 1904 delay, 1907–1908 delay, electric wiring delay, cement change, and interest on progress payments, and that as to the item of 1906 delay and the sheeting charges the judgment should be reversed and a new trial ordered with respect to said items, with costs to appellant to abide the event.

PAGE, J., concurred; SMITH, J., concurred in reversal as far as claim for sheeting is involved.

CLARKE, P. J.:

I concur in so much of the opinion of Mr. Justice SHEARN as affirms the dismissal by the trial court of the various causes of action for damages. In regard to the damages for delay in the year 1906, also dismissed by the trial court, but as to which dismissal Mr. Justice SHEARN advises reversal, I dissent and am of the opinion that this cause of action was also properly dismissed. Under clause " EE " of the contract it is provided: " This contract is made and entered into with the express understanding and agreement that the work shall progress and be carried on in such places and in such parts as may be directed and required by the borough president, by and through the direction of the engineer." The direction to suspend work was not to suspend work upon the whole contract, but upon a small specific portion thereof for special reasons and was in my opinion clearly within the meaning and intent of the clause quoted and within the power of direction of the engineer. Even if the direction be considered the exercise of the right of suspending the work under clause " K," I do not agree with Mr. Justice SHEARN that such direction must have come from the borough president or the commissioner of public works because paragraph "A" provides: " Wherever the term ' President ' is used, or a pronoun in its place, it shall refer to and mean the President of the Borough of Manhattan or his authorized representative," and that such representative is only the commissioner of public works. I am of the opinion that in respect to the

details of carrying out the provisions of this contract the engineer was the authorized representative of the borough president. The contract gave the right to the city through the borough president or its duly authorized representative to suspend the whole or any part of the work. The direction was given in writing under date of May 3, 1906, by the engineer. On October 30, 1906, a letter was sent by the same engineer to the contractors authorizing and directing them to continue the work. I think that the proof shows that the borough president was aware of this matter on May tenth and it is not a strained inference to hold that the action of the engineer was authorized and directed by him. There was no protest from the contractor, simply a request for the payment of additional moneys out of the retained percentages.

I also dissent from so much of the opinion of Mr. Justice SHEARN as reverses the finding of the jury in favor of the city upon the item for "sheeting" and directs a new trial. It must be recalled that there was a final certificate in this case. There was no question of fraud or bad faith in the issuance of this certificate. The court left to the jury the question whether there was a mistake therein and upon that issue the jury found a verdict for the city upon disputed facts. It does not seem to me that this verdict is against the evidence or the weight thereof. In my opinion, therefore, the judgment appealed from should be affirmed, with costs to the respondent.

DOWLING, J., concurred.

Judgment affirmed as to items of 1904 delay, 1907–8 delay, electric wiring delay, cement change and interest on progress payments; and reversed as to item of 1906 delay and sheeting charges, and new trial ordered with respect to said items, with costs to appellant to abide event. Order to be settled on notice.