Johit P. GrUALTiEEi, J.
This is a claim for damages arising out of a highway construction contract between the claimant and the State, dated October 21, 1960, which provided for the construction of 5.42 miles of roadway on Interstate Route 502 in Clinton County for the sum of $2,165,588.50.
The proposal was given out to prospective bidders on August 31,1960. The bids were to be submitted by September 21, 1960, giving the bidders a period of approximately three weeks within which to study the details contained in the proposal and make such physical investigations and studies as were possible to make within the allotted time.
It cost the claimant $536,320.19 in excess of the contract price to complete the job. It is the contention of the claimant that this substantial additional cost was brought about because of the misrepresentation of quantities of Item 2-S of the contract, that the State withheld from bidders material physical facts known to it and its representatives, that it improperly altered quantity estimates under the 2-S category and that it compelled the claimant to use a substantial amount of material nowhere mentioned in the proposal. It is claimed that by reason of the State’s conduct the claimant was mislead and deceived and that when it entered into the performance of the contract it was confronted with conditions which resulted in its having been obliged to perform an entirely different contract than that upon which it was invited to bid.
While the State gave out the proposal in 1960, its engineers and surveyors had been engaged in making detailed physical studies of the area embraced in the contract since 1957. These preliminary studies indicated that there would be required 1,550,000 cubic yards of unclassified excavation in Item 2-S. This estimate was given in May of 1957. The State, in order to reduce the estimated cost of the job, asked the engineers to revise their estimates. In October of the same year they so altered their figures that they came up with an estimated figure of 823,037 cubic yards of unclassified excavation. In the original quantities given in May of 1957, a quantity of Item 2-EC, select borrow, was provided for. In the revised figures given in October not only was the estimated quantity of unclassified excavation reduced by almost one half but the 2-EC material was not mentioned at all.
It may be well at the outset, in order to understand and evaluate the claimant’s contentions, to set forth the quantities contained in the proposal and the actual quantities found to be required when the job was completed. They are as follows:
*331 Contract Actual
Estimates Quantities
Unsuitable material including
stripping and topsoil.......... 89,819 c.y. 224,722 c.y.
Bock Excavation .............. . 15,656 c.y. 22,163 c.y.
Common Borrow.............. . 686,869 c.y. 482,986 c.y.
Common Excavation........... 29,004 c.y. 48,208 c.y.
821,348 c.y. 778,129 c.y.
However, in addition to the 778,129 cubic yards actually found to be required, the claimant was directed to furnish an item, 2-EC, select borrow, a more expensive and superior material not mentioned in the proposal at all. By the time the job was completed the claimant had to provide 501,518 cubic yards of this material, almost one half of the total quantities furnished under 2-S, which gives weight to the claimant’s position that after it signed the contract it was called upon to perform an entirely different contract than that envisioned in the proposal.
The ultimate actual quantities found to be required under Item 2-S, including the 501,518 cubic yards of 2-EC material not mentioned in the contract, totaled 1,279,647 cubic yards which, as estimates go, was closer to the original May, 1957 estimates of 1,500,000 cubic yards.
It is obvious that the necessity for the claimant’s furnishing 501,518 cubic yards of 2-EC, not mentioned in the contract, caused the wide variation in the other quantities contained in the other portions of Item 2-S.
This brings us to a consideration of whether or not this case falls within that line of established decisions that hold that a bidder must not rely upon preliminary estimates, that he must submit his bid based upon the estimates contained in the proposal and that the State is not liable in damages if there should later be found to be a radical variance in the estimates and the actual quantities found to be needed. A unit price is fixed in the contract and the contractor is bound by the unit price to which he agreed when he signed the contract whatever the quantities involved. (Yonkers Contr. Co. v. New York State Thruway Auth., 25 A D 2d 811, affd. 23 N Y 2d 856; Johnson Corp. v. City of New York, 162 Misc. 665, affd. 251 App. Div. 811, mot. for lv. to app. den. 276 N. Y. 688; Depot Constr. Corp. v. State of New York, 23 A D 2d 707, affd. 19 N Y 2d 109.)
Here, however, we have a different situation. When it signed the contract claimant had no opportunity to set a price for which *332 it was willing to furnish Item 2-EC because this select material was nowhere referred to in the proposal. The rule that a contractor is bound by the unit price established in the contract, whatever the quantities, has no application here.
By omitting from the proposal any mention of Item 2-EC the State misrepresented a very substantial, almost one half, of the type of material required under Item 2-S of the contract and misrepresented to a prospective bidder the nature of the contract to be performed at a time when the bidder was planning his material sources, equipment and work schedules.
The State knew all along that Item 2-EC would be required. It was indicated in the initial investigations as early as May of 1957. It admits that the omission of this material from the proposal was due to careless procedures on the part of the officials responsible for the preparation of the proposal. In a memorandum dated January 21, 1961 which seeks to explain the reason for the omission of Item 2-EC from the proposal, appears the following language: “It would seem a very advantageous practice if the plans and work-ups of the various consultants could be reviewed by the members of the interested district, at least two weeks before the final * * * bid offerings to bidders. In this way other persons who have had experience in this line of work could have a chance to see what had been worked up and possibly offer a few constructive suggestions ”. Also, in Exhibit 10, which was Supplemental Agreement No. 3, sheet 2 of 9, a State official in explaining the reason for the omission of 2-EC material used the following language: 1 ‘ Under similar conditions in Interstate contracts both north and south of this project, Item 2EC was specified for replacing removed muck and humus. The item was inadvertently omitted from this contract.”
The State does not claim that this omission was due to unknown physical conditions resulting in an honest mistake on its part for which it could not be held legally responsible. (Johnson Corp. v. City of New York, 162 Misc. 665, affd. 251 App. Div. 811, mot. for lv. to app. den. 276 N. Y. 688.)
It appears that it was omitted, the State says, ‘1 inadvertently ’ ’, with full knowledge that this material would be required. The claimant should not be asked to bear the financial loss resulting from the State’s admitted bungling procedures which compelled the claimant to furnish 501,518 cubic yards of material which it never contemplated when it signed the contract.
The State’s main defense to this claim is that, notwithstanding its admitted error in failing to include Item 2-EC in the proposal and thus obtain a unit price therefor, that the claimant *333 gave up any possible claim for resultant damages by executing three separate supplemental agreements for the supplying of this 2-EC material. Initially it was estimated that not more than 125,000 cubic yards of 2-EC material would be required at which time claimant agreed to a price of $1.25 a cubic yard. As work progressed the quantities grew until it reached a figure of 501,518 cubic yards. Under the pressure of getting the job done, while construction was in progress, the claimant agreed in a subsequent supplemental agreement to the same unit price of $1.25 even though the State officials on the job felt that the figure should have been $1.45 a cubic yard and so recommended to their superiors who, nonetheless, insisted that the State would pay no more than $1.25 per cubic yard.
To deprive the claimant of its right to damages because it signed these agreements under the circumstances then existing would result in a miscarriage of justice. It had no alternative but to accept whatever price the State was willing to pay and at the very time that it was executing these contracts it did so under protest asserting that the necessity of furnishing these large quantities of previously unmentioned material was disrupting its work program and causing it to sustain the damages established.
This court will not construe the supplemental agreements executed by the claimant under pressure, as the State would like to have it do, as a general release, relieving the State of damages incurred by this claimant as a result of an admitted material misrepresentation.
The court is mindful of the decisions to the effect that the execution of a supplemental agreement may bar any future claims for damages. (Quinn-Meissener, Inc. v. State of New York, 268 App. Div. 936; Ryan v. City of New York, 179 App. Div. 181.) However, it does not feel that the legal principles established therein should go so far as to relieve the State of responsibility for the damages claimant has suffered under the facts established here.
The rule is as stated in Borough Constr. Co. v. City of New York (200 N. Y. 149, 156-157) reiterated in Collins v. State of New York (259 N. Y. 200) as follows: “ The underlying justice of the principle is that where a municipal representative having authority to speak for it and supposed to be familiar with such matters in apparent good faith and with a show of reason requires a contractor to do certain things as covered by his contract, the contractor although protesting against the requirement ought not to be compelled to refuse obedience and incur the hazard of becoming a defaulter on his contract even though *334 it shall subsequently turn out that he was right and the municipal representative wrong in the dispute. The theory involves the idea that the requirement of the municipal representative finds some reasonable basis in the contract and that the question whether his demand is proper or improper is one Avhich may be the subject of some doubt and debate and in respect of which the contractor might prove to be mistaken if he should refuse to do what was required of him, and there is no justification for applying it where the municipal representative requires something which is so palpably and manifestly beyond the provisions of the contract that the contractor would not be confronted by any of the legal perils of an erroneous decision if he should refuse to obey.”
The State, though a sovereign power, should adhere and conform to the accepted standards of fair dealing which binds individuals and should be ready and willing to pay damages for its own admitted error rather than pass these losses on to an innocent bidder who Avas misled in signing a contract based upon misleading and erroneous information. (People v. Stephens, 71 N. Y. 527; Danolds v. State of New York, 89 N. Y. 36.)
The contractor was placed in a dilemma when it was confronted with the requirement of furnishing these large quantities of Item 2-EC not previously mentioned in the contract. It could refuse and walk off the job and face the peril of a suit by the State for failure to perform or it could as it did here comply with the State’s demands under protest. Under these circumstances the compliance under pressure with the State’s demands should not relieve the State of responsibility for its misrepresentation.
There had to be radical changes in work schedules, the entire job had to be reorganized in a manner that could not have been conceivably anticipated in view of the time given to submit bids. Two or three months were wasted while the State was making up its mind as to the amount of 2-EC material which would be required and as to the unit price it Avould be willing to pay, with the resultant disruption of work schedules and progress. Because the State refused to give the necessary extensions, brought about by its own misrepresentation, it was necessary for the claimant to accelerate its work schedule, hire additional manpower and to work more than the normal day’s schedule.
All of this could have been avoided by informing the bidders of the real situation in the first instance. A unit price for 2-EC, which the State knew would be required, should have been established when the claimant was preparing its bid, Avithout the stress of pressures of negotiating it during construction. Had *335 this been done the claimant would have been put on notice that this material would be required in some quantity and would have been bound by the agreed unit price.
The court holds that in the execution of the supplemental agreements the claimant did not release its right to seek damages, that it expressly and repeatedly informed State representatives that it would hold the State responsible for damages by reason of the gross misrepresentation of the contract. (Borough Constr. Co. v. City of New York, 200 N. Y. 149, supra; Collins v. State of New York, 259 N. Y. 200, supra.)
The State also urges the usual defense that the claimant failed to comply with the technical provisions of the contract with reference to the manner in which extra costs are to be processed. It put the claimant in the position of having to perform a contract it knew nothing about when it was signed. It cannot now be heard to insist upon strict compliance with these provisions.
The court concludes that the State is liable for the damages sustained by this claimant. The extra costs were carefully and meticulously recorded. The State’s auditors have had a full opportunity to go over the claimant’s records and the State has not disputed any of the items or the total extra expenses claimed.
From the evidence and the documents submitted, the court finds that claimant has been damaged in the sum of $536,320.19 for which sum judgment is directed with interest thereon from May 4, 1963, three months after the acceptance of the contract by the State, to the date of entry of judgment herein.