County Asphalt, Inc., Respondent, *v.* State of New York, Appellant.   (Claim No. 42891.)

Third Department, November 9, 1972.

*Louis J. Lefkowitz, Attorney-General (Ruth Kessler Toch* and *Ruth V. Iles* of counsel), for appellant.

*Jarvis, Pilz, Buckley & Treacy (Thomas B. Treacy* of counsel), for respondent.

STALEY, JR., J. This is an appeal from a judgment in favor of claimant, entered December 16, 1969, upon a decision of the Court of Claims.

Respondent has been awarded the sum of $536,320.19 for damages for breach of contract arising out of a highway construction contract for 5.42 miles of highway on Interstate Route 502 in Clinton County.

The claim alleges that the State made misrepresentations and omissions relative to the amount of unclassified material to be excavated under Item 2-S; the amount of "Select Borrow" required under Item 2-EC; and the design of slopes. The contract was advertised for bids on August 31, 1960 with the formal opening of bids on September 21, 1960. The contract was awarded to respondent and, on October 21, 1960, the contract was formally executed. The completion date set in the contract was October 15, 1962. The contract was completed on December 7, 1962 and was accepted by the State on February 4, 1963.

The claim contains two causes of action; the first relating to the payment of the balance due on the contract and the return of bonds on deposit with the State; and the second for damages for the State's breach of contract due to the acts and omissions of the State requiring respondent to perform unclassified excavation not contemplated by the contract under Item 2-S. Respondent seeks damages for the increased cost and expense in the performance of its work due to the excavation of additional amounts of unclassified material not contemplated or intended by the contract.

The preliminary engineer's estimate, dated May 2, 1957, indicated that the quantity of Item 2-S to be excavated was 1,550,000 cubic yards while the amount specified in the contract estimate was 900,000 cubic yards, and the estimate also indicated that the quantity of Item 2-EC required was 40,000 cubic yards which amount was eliminated entirely in the contract estimate. The State Soils Bureau review and analysis of the original design

of the project indicated approximately 266,000 cubic yards of unsuitable material, while the State's proposal indicated that only 89,819 cubic yards would be encountered. The actual quantity of unsuitable material excavated was 224,722 cubic yards and the actual quantity of Item 2-EC furnished was 501,518 cubic yards. The total quantities of excavation and borrow under Items 2-S and 2-EC totaled 1,279,647 cubic yards which was much closer to the engineer's original estimate of 1,550,000 cubic yards and exceeded the amount shown on the contract documents by 458,299 cubic yards.

In the examinations before trial of the State's representatives they were unable to explain why Item 2-EC had been eliminated from the contract, although they knew of the necessity for the Item, nor were they able to explain why the quantity of Item 2-S was so drastically reduced. It was admitted by the State's Design Engineers that, prior to the preparation of the contract estimates, they had been directed to reduce the dollar value of the construction contract resulting in lowering the height of fill for the entire project.

On January 26, 1961, prior to the commencement of the excavation work, the State wrote to the Resident Engineer stating that the State would have to negotiate Item 2-EC which it did not include in the contract. When the contractor started removal of unsuitable material on March 1, 1961, it found it was impossible to backfill with Item 2-S and had to use in its place '' Select Borrow '', Item 2-EC.

On or about August 7, 1961 respondent and the State entered into an agreement to supply Item 2-EC at a price of $1.25 per cubic yard based on a maximum of 125,000 cubic yards. This price was established as the cost of supplying, trucking and placing Item 2-EC on the job site. By September 15, 1961 it became apparent that additional '' Select Borrow '' would be required and, on or about December 15, 1961, Supplemental Agreement No. 2 was negotiated for additional quantities of Item 2-EC at the price of $1.25 per cubic yard, although respondent requested a price of $1.45 per cubic yard which price it claimed was the actual unit cost encountered in furnishing and placing Item 2-EC. A further Supplemental Agreement No. 3 was entered into for additional quantities of Item 2-EC. Upon receipt of proposed Supplemental Agreement No. 3, respondent set forth its verified statement of claims in a letter dated June 17, 1963 which statement was attached to said Supplemental Agreement No. 3.

. The State has paid respondent in full for the material supplied under Item 2-EC and respondent's claim is limited solely to its cost for Item 2-S. On October 30, 1961 respondent wrote the District Engineer stating that, by reason of the larger quantity of unsuitable material it had to remove and which was not indicated in the contract estimate, respondent would continue to incur additional costs for which it would look to the State for reimbursement. The State also, after the contract was executed, changed the typical section requiring excavation of the total width of the original section from shoulder to shoulder at depths greater than those indicated on the contract drawings. The Court of Claims found that the State was aware, prior to the letting of the contract, that changes in slopes and larger quantities of unsuitable excavation would be required.

Respondent based its damages on the State's failure to make a prompt decision as to the quantity of Item 2-EC which caused serious delays in the performance of work under Item 2-S; the change in respondent's methods of operation since it became necessary to employ a dragline and trucks to remove the materials in areas in which no unsuitable material had been indicated, instead of by less expensive methods involving scrapers and bulldozers; the increase of the total amount of unsuitable material from 88,330 cubic yards as represented in the contract documents to 224,772 cubic yards of actual unsuitable material; and the refusal of the State to grant an extension of time which resulted in scheduling work on double shifts in order to make up for the delays encountered during the course of the job. Respondent's proof of the additional costs was carefully recorded and proved, and the State has not disputed any of the items or the total expense claimed.

By order dated December 3, 1963, the first cause of action was severed and tried, and judgment in favor of respondent was entered on December 12, 1963 in the amount of $94,071.25, which judgment reserved until the final determination of the remainder of the claim, the question of interest on the severed cause of action.

The judgment appealed from here includes interest in the sum of $2,780.32 on the total sum of the severed judgment which included the amount of the bonds on deposit which were returned. Appellant claims that the Court of Claims erred in allowing interest on the severed judgment since respondent should have accepted the check tendered by the State as final payment on or about October 5, 1963, and that respondent's rejection of the check constituted a waiver of interest under

the contract. The State did not oppose the motion for sever-ance and did not oppose the order which reserved the question of interest until the determination of the remaining cause of aciton. On the basis of *Higgins & Sons* v. *State of New York* (20 N Y 2d 425), the allowance of interest on the balance of $24,601.63 due on the contract should be affirmed. However, the allowance of interest on the amount of bonds returned should be denied and the sum allowed for interest should be modified and reduced to the sum of $970.56.

Appellant contends, as to the second cause of action, that there were no misrepresentations as to the subsurface condi-tion of the soil and that respondent's failure to make any inde-pendent subsurface investigation or analysis of soil conditions estops it from asserting any claim for damages. Respondent had three of its representatives inspect the job site and two of its representatives inspect all available information from the State prior to its bid. From the date of advertisement for bids and submission of bids, there was only a period of three weeks in which to review the plans and specifications, inspect the job site and prepare its bid, and there was insufficient time to con-duct an independent subsurface exploration.

Respondent's inspection of the job site did not indicate any difficulties as to the location and extent of unsuitable material. Any inspection that could possibly have been made within the three-week period between the advertisement for bids and the opening thereof, would not have revealed the subsurface condi-tions to the point where it could be said that the prospective bidder should be forced to rely on this limited exploration over the misleading information supplied by the State which was a result of over three years of investigation, particularly in view of the omissions of information in the contract estimate of which the State had knowledge.

The State's omission of any requirement for Item 2-EC, which it had prior information would be required for the contract, and the requirement for use of only common borrow, indicated to the bidder that unsuitable material was limited in depth and could be excavated leaving a reasonably dry, hard surface on which common backfill could be placed.

The Court of Claims, in its decision (63 Misc 2d 329, 332) stated as follows:

" By omitting from the proposal any mention of Item 2-EC the State misrepresented a very substantial, almost one half, of the type of material required under Item 2-S of the contract and misrepresented to a prospective bidder the nature of the

contract to be performed at a time when the bidder was planning his material sources, equipment and work schedules.

" The State knew all along that Item 2-EC would be required. * * * It appears that it was omitted, the State says, ' inadvertently ', with full knowledge that this material would be required. The claimant should not be asked to bear the financial loss resulting from the State's admitted bungling procedures which compelled the claimant to furnish 501,518 cubic yards of material which it never contemplated when it signed the contract."

The finding of the Court of Claims that the State did misrepresent the subsurface conditions is supported by the record. The State set forth in its contract estimate the exact quantities and location of unsuitable material to be excavated. It further represented, by its omission of Item 2-EC, that, after the unsuitable material was removed, the remainder could form a reasonably hard, dry surface on which Item 2-S, common borrow, could be used as backfill. The record further indicates that the State knew or should have known that conditions existed that were not reflected in the information given to prospective bidders.

A contractor has the right to rely on the State's representation that excavated earth could be used as fill. (*Dolomite Prods. Co.* v. *State of New York,* 258 App. Div. 294, mot. for lv. to app. den. 283 N. Y. 777.)

In *Rusciano Constr. Corp.* v. *State of New York* (37 A D 2d 745, 746), the court stated as follows: " The exculpatory clauses in the contract and in the invitations to bid do not insulate the State from liability where the conditions are not as represented in the contract and inspection by the contractor would not reveal the representations to be false. (*Foundation Co.* v. *State of New York,* 233 N. Y. 177, 184-185; *Cauldwell-Wingate Co.* v. *State of New York,* 276 N. Y. 365.) The State's representative not only knew of the presence of this unsuitable material but also knew that it was unstable in its wet condition and the State is, therefore, answerable for its failure to put bidders on notice of that condition in the contract proposals."

The State's misrepresentations and omissions, subsequent delaying tactics and changed procedures took the work performed out of the contract and respondent was accordingly entitled to damages for the additional costs and expense incurred. (Cf. *Warren Bros. Co.* v. *New York State Thruway Auth.,* 34 A D 2d 97.)

Appellant further contends that the execution by respondent of the supplemental agreements for the supply of Item 2-EC

precluded respondent from asserting any claim for damages resulting from the State's failure to include Item 2-EC in the contract estimate or from its misrepresentations as to the quantity of Item 2-S to be excavated.

Respondent admits it has received full payment for the quantities of Item 2-EC supplied and its second cause of action is limited to the additional costs incurred in the performance of the contract under Item 2-S. There is no question that the unit price of $1.25 per cubic yard for Item 2-EC covered only the cost of the material and the loading, hauling and placing it on the job site. The evidence establishes clearly that there was never any intention on the part of the State in paying respondent for Item 2-EC and entering into the supplemental agreements to preclude respondent from prosecuting its claim for damages under Item 2-S. Respondent made it clear during the performance of the contract that it intended to hold the State responsible for its additional costs incurred relative to Item 2-S. When the final Supplemental Agreement No. 3 was received by respondent, it signed it subject to a verified statement of its claim under Item 2-S.

The Court of Claims found that the supplemental agreements did not prevent respondent from recovering the increased costs it encountered in the performance of Item 2-S stating as follows (p. 335): "The court holds that in the execution of the supplemental agreements the claimant did not release its right to seek damages, that it expressly and repeatedly informed State representatives that it would hold the State responsible for damages by reason of the gross misrepresentation of the contract. (*Borough Constr. Co.* v. *City of New York*, 200 N. Y. 149; *Collins* v. *State of New York*, 259 N. Y. 200.) "

The award of damages for the breach of contract resulting from the State's omission and representations in its contract proposals should be affirmed.

The judgment should be modified, on the law and the facts, by reducing the amount of interest on the first cause of action to $970.56, and, as so modified, affirmed, without costs.

HERLIHY, P. J., GREENBLOTT, KANE and REYNOLDS, JJ., concur.

Judgment modified, on the law and the facts, by reducing the amount of interest on the first cause of action to $970.56, and, as so modified, affirmed, without costs.