The Foundation Company, Appellant, *v.* The State of New York, Respondent.

Contract — state — when contractor cannot recover on ground that, owing to mistake in estimates by state officers, completed work was more expensive than contemplated — effect of reversal by Appellate Division of finding and dismissal of claim without making new finding — when contractor may recover on quantum meruit for extra work required by changes in plans — no recovery where change is merely permissive.

1. A contract and specifications may contain representations as to existing physical conditions. If so, a bidder may rely upon them, even though ·it be provided that he shall satisfy himself by personal inspection and investigation as to their truth, where because of time or situation such investigation would be unavailing; or statements

may be made on which the bidder, because of the language of the contract, cannot rely. He may have agreed that he will not. Then if they are made in good faith he takes the risk of their accuracy.

2. Where specifications for a public work required the sinking of caissons to bedrock, and investigation previously made by the state had shown that bedrock would be reached at a certain depth, and plaintiff, relying upon such investigation and information obtained from a " boring sheet " furnished it, at its request, by the state, which sheet did not purport to be one of the plans on which bids were asked, entered into a contract to do the work, which contract contained a clause " that he shall make no claim against the State because any of the estimates, tests or representations of any kind affecting the work made by an officer or agent of the State may prove to be in any respect erroneous," and it subsequently developed that bedrock could not be reached at the depth estimated and that much and expensive excess excavation was required, the mistake on the part of the officer of the state appearing to have been honestly made and not in bad faith, no recovery can be had upon the ground that the completed work was more expensive than the parties expected.

3. Where the Appellate Division reverses a finding of the Court of Claims but makes no finding to the contrary, this court, on appeal from a judgment dismissing the claim, may consider the testimony favorable to the appellant.

4. Where the estimates, plans and specifications for a part of the work contemplated a single cofferdam, in connection with which a single pumping system might be installed, but state officials, under a reserved power in the contract to make changes in the plans and specifications and pursuant to the provisions thereof, directed alterations in the plans so as to require seven distinct pumping operations instead of one, with an increased number of pumps and workmen, with separate installations and other items of expense, the contractor may recover on a *quantum meruit* for the reasonable value of the work performed.

5. Where a change in the method of construction is merely permissive and not such a change or alteration as provided for in the contract, the fact that the method adopted required a more expensive method of pumping is immaterial. (*Borough Const. Co.* v. *City of New York*, 200 N. Y. 149, distinguished.)

*Foundation Co.* v. *State of New York*, 193 App. Div. 513, modified.

(Argued March 3, 1922; decided April 18, 1922.)

APPEAL from a judgment, entered March 23, 1921, upon an order of the Appellate Division of the Supreme

Court in the third judicial department reversing a judgment in favor of plaintiff entered upon an award of the Court of Claims and dismissing the claim against the state.

*Edwin D. Worcester* and *Henry G. Seipp* for appellant. The state furnished erroneous and misleading data upon which the claimant relied and under the particular circumstances in this case had a right to rely in making its bid. (*Hollerbach* v. *U. S.*, 233 U. S. 165; *Christie* v. *U. S.*, 237 U. S. 234; *U. S.* v. *Spearin*, 248 U. S. 132; *U. S.* v. *Atlantic Dredging Co.*, 253 U. S. 1; *Mulholland* v. *Mayor*, 113 N. Y. 631; *Horgan* v. *Mayor*, 160 N. Y. 516; *Langley* v. *Rouss*, 185 N. Y. 201; *Faber* v. *City of New York*, 222 N. Y. 255; *Leary* v. *Watervliet*, 178 App. Div. 938; *Matter of Semper* v. *Duffey*, 188 App. Div. 984.)

*Charles D. Newton*, Attorney-General (*Carey D. Davie* of counsel), for respondent. The state did not warrant the existence of rock or other impervious material at or above elevation 148 at the site of caissons Nos. 16, 17 and 18. (*Simpson* v. *United States*, 172 U. S. 372; *Goodrich* v. *United States*, 47 U. S. Ct. of Cl. 200; *Hollerbach & May* v. *U. S.*, 233 U. S. 165; *Christie* v. *U. S.*, 237 U. S. 234; *Sundstrom & Stratton* v. *N. Y.*, 213 N. Y. 71; *Semper* v. *Duffey*, 227 N. Y. 151; *Faber* v. *City of New York*, 222 N. Y. 235; *Leary* v. *City of Watervliet*, 222 N. Y. 337; *Snare & Triest Co.* v. *City of New York*, 191 App. Div. 184; *Lewman* v. *U. S.*, 31 U. S. Ct. of Cl. 470; *Callahan* v. *U. S.*, 47 U. S. Ct. of Cl. 177.) The state did not warrant that there would be not more than 200 cubic yards (or, as found by the Court of Claims, not more than 230 cubic yards) of concrete pneumatic caisson work below elevation 148. (*Faber* v. *City of New York*, 222 N. Y. 255; *Sullivan* v. *Village of Sing Sing*, 122 N. Y. 389; *Leary* v. *City of Watervliet*, 222 N. Y. 337; *Lewman* v. *United States*, 31 U. S. Ct. of

Cl. 471; *Callanan Const. Co.* v. *United States*, 47 U. S.
Ct. of Cl. 177; *Snare & Triest Co.* v. *City of New York*,
191 App. Div. 184.)   The claim for pumping is one for
extra work and not for damages growing out of a breach.
The order required by the law and by contract for such
work was never sought by claimant and never given by
the state engineer nor approved by the canal board.   The
failure to secure such an order for work that, as is urged
here, is extra work, is fatal.   (*Plumley* v. *United States*,
226 U. S. 545; *O'Brien* v. *Mayor, etc.*, 139 N. Y. 543.)

ANDREWS, J.   The state designed a dam across the
Mohawk river at Scotia with a canal lock at its south end.
At this point a layer of gravel underlay the bed of the
stream.   Upon it the dam could not safely rest.   Nor
might cofferdams be used in its construction.   It was
determined, therefore, to sink caissons under compressed
air to bedrock for the whole distance.   The final
result would be a solid concrete cut-off wall, on top of
which would be placed the other structures necessary to
complete the dam.   The caissons were to be twenty-four
in number.   Three of them were to extend beyond the
others a considerable distance up and down the current,
to support the piers of a bridge from which the dam gates
were to be operated.   For various reasons the expense
of building caissons very rapidly increases with the
increased depth to which they are to be lowered.   It
would become important, therefore, to any one under-
taking this work to ascertain the situation of the bedrock.
Investigation of this question had previously been made
by the state, apparently for its own information.   Its
borings showed that everywhere bedrock would be
reached above elevation 148, with one exception, where
above that level it found " rock or boulders."   The lock
was also to be built of concrete.   To accomplish this work
it would be necessary to screen the site by sheathing or in
some other way so as to make it water tight and to pump

the water therefrom.  The cost of this pumping item depended largely upon the method to be adopted.

The appellant entered into a unit price contract with the state to build this dam and lock.  The claims it now makes are based on two propositions.  It says that when it made its bid, it and the state both understood that bedrock would be found not lower than level 148.  The state so represented and warranted.  As a fact under three caissons it was obliged to excavate 556 cubic feet below this level.  Against its protest the state compelled it to do this work — a work never contemplated by either party when the contract was made.  It says also that while for the lock no more water was lifted than was always supposed to be necessary, the state so changed its plans that the method necessarily adopted was far more costly than that at first designed.  Consequently, the bid for pumping did not fairly measure the actual cost.  For the first of these items the Court of Claims awarded the appellant $11,417; for the second $62,272.21.  The Appellate Division, however, reversed as to both on the law and the facts and dismissed the claim.  But there is little or no dispute as to the circumstances surrounding the transaction.

Originally an attempt was made by another corporation to build this dam.  It tried to use cofferdams for that purpose.  The attempt was a failure and the contract was canceled.  It seemed that the caisson method was necessary.  The state had, as we have seen, bored a number of holes near the site of the proposed work with a wash drill.  This is not always satisfactory.  A diamond drill is more accurate but more expensive.  The state officials believed that they had found bedrock everywhere above level 148.  In this, however, they were mistaken.  In 1912 plans were prepared and bids were invited by four advertisements published between June 6th and June 26th, 1912.  Proposals would be received until July second.  When this advertisement came to the

notice of the appellant does not appear.  In his opening
before the Court of Claims, however, its counsel seems to
assume that it saw it at the time of its first insertion.
Prospective bidders were told that various papers and
plans and other information might be had at the office of
the superintendent of public works.   The claimant applied
for this information.   It was given, among other things,
a sheet of drawings showing the plan and elevation of the
caissons which represented them as resting on bedrock,
but which contained no figures showing the depth at
which bedrock would be found.   It was told that the
excavation lines and base of the structure as shown
were but approximate.   No statement was made as to
the borings made by the state, nor did the boring sheet
on which its results were recorded accompany the plans.
In the course of its investigations, however, before pre-
senting its bid, the claimant learned that such borings had
been made and at its request this boring sheet was fur-
nished to it.   On its face it did not purport to be one of
the plans on which bids were asked, but stated that it
was made " to accompany supplemental report of board
of consulting engineers."   The claimant made no bor-
ings of its own, although there is some evidence that
would justify the conclusion that it would have been
enabled to check up the results obtained by the state in
two weeks.   It seems to have known how the borings
had been made by the state, and it was aware that bor-
ings obtained by a wash drill were not always accurate.
At the same time there was also handed to the claimant
a paper called " information for bidders," a preliminary
estimate of quantities and costs made by the state, a
form of itemized proposals to be executed by the bidder, a
proposed form of contract and the specifications which
were made a part of it.   The preliminary estimate of
quantities and costs contained an item called a " con-
tingent item " for 200 cubic yards of concrete pneumatic
caisson work below elevation 148, and an estimate by

the state engineer that this would cost forty dollars per cubic yard. The information for bidders stated that the estimate of quantities is to be accepted as approximate only, and the bidders are required to form their own judgment as to quantities and character of the work by personal examination upon the ground and on the specifications and drawings relating thereto, or by such other means as they shall choose, and their attention was specifically called to paragraph 10 of the contract (an error for paragraph 11). This paragraph is to the effect that the contractor agrees that he has satisfied himself by his own investigation and research regarding all the conditions affecting the work to be done and labor and material needed, and that his conclusion to execute the contract is based on such information and research and not on the estimate of quantities or other information prepared by the state engineer, and " that he shall make no claim against the State because any of the estimates, tests or representations of any kind affecting the work made by any officer or agent of the State may prove to be in any respect erroneous." Under these circumstances the claimant bid, among many other items, for 200 cubic yards of caisson work below elevation 148 at twenty-five dollars a cubic yard. It received the contract to build the dam, and to do all the work necessary therefor. The work to be done is described as building three concrete pneumatic caissons, each sixty-four by fourteen feet, with tops at elevation 209, and bottom of foundation on bedrock at about elevation 166 for the southerly pier; at about elevation 156 for the middle pier; and at about elevation 149 for the northerly pier; and as building concrete pneumatic caisson cut-off walls between the piers and to shore, extending up to elevation 209 and down to bedrock. Payment was to be made at one price for work between levels 209 and 148 and at another for that below 148. If any item in the contract exceeds the quantity of the engineer's estimate by more than fifteen

per cent the engineer shall certify this fact to the canal board and the canal board shall thereupon determine whether the work shall be completed by the contractor under the terms and at the price specified in the contract, or whether it shall be done by the superintendent of public works, or whether a special contract shall be made for such excess.

It is clear that this was not a contract to build three piers with foundations at a certain depth. It was a contract to rest these foundations on bedrock. It cannot be argued, therefore, that in any event the doctrine stated in *Borough Construction Co.* v. *City of New York* (200 N. Y. 149) is applicable. Indeed, we do not understand that any such position is taken by the appellant.

Having received its contract the claimant began to sink its caissons. It commenced not far from the north bank of the river. It was soon found that under three of these caissons, to reach bedrock or to reach hardpan, which was equally satisfactory to the state, it was necessary to go a considerable distance below elevation 148, and that much more than two hundred cubic yards of excavation below that elevation would be required. Protests were made by the claimant. But after some negotiations and the exchange of letters the engineer certified to the canal board that as to this item the work required would exceed his estimate by more than fifteen per cent and the board determined that the excess thereof should be completed by the contractor under the terms and at the prices specified in the contract and so notified the claimant. Thereupon the claimant was required to and did excavate the 556 cubic yards below elevation 148.

Concededly, all the work done by the contractor was done well and honestly. Concededly, it was done at a loss. Yet, under the terms of the contract, its claim for this item may not be allowed, and this for two reasons.

A contract and specifications may contain representations as to existing physical conditions. If so, a bidder

may rely upon them, even though it be provided that he shall satisfy himself by personal inspection and investigation as to their truth, where because of time or situation such investigation would be unavailing (*Faber* v. *City of New York*, 222 N. Y. 255); or statements may be made on which the bidder, because of the language of the contract, cannot rely. He may have agreed that he will not. Then if they are made in good faith he takes the risk of their accuracy. (*Leary* v. *City of Watervliet*, 222 N. Y. 337; *Matter of Semper* v. *Duffey*, 227 N. Y. 151.) Such is the situation here even if we assume that the boring sheet was one of the documents upon which the bidder was entitled to base his bid. There was no bad faith. There was, so far as appears, an honest mistake on the part of the officers of the state. And the contractor agrees to make no claim because any estimate, test or representation affecting the work made by any such officer is erroneous. Aside from the boring sheet there is no representation. While the plan of the dam has no figures showing the depth of foundations, it is possible a scale would show that they are all above level 148. Yet, if so, they are to be " considered as only approximate." In the description of the work it is said of the pier adjoining the caissons where the deepest excavation occurred, that its foundation was to be on bedrock " at about elevation 156." As a matter of fact it is at 147.75, and as to this no complaint is made. The claim is that the conclusion might be drawn that the adjacent caissons need not be deeper, but as to them no statement at all is made. And both these subjects are also covered by the agreement just referred to, deliberately made by the claimant. It is said both the state and the contractor were mistaken as to a most important fact. It may be so. It may be that the contract could have been abandoned on the ground of mutual mistake. Even if this be so, where completed no recovery can be had on the ground that the work was more expensive than the parties expected.

If, however, notwithstanding the agreement as to honest mistake, damages might be recovered from the state for misrepresentations, upon which the bidder might rely, the boring sheet was not such a representation. It formed no part of the plans upon which the contract was based. It was not prepared or used for that purpose. It was an independent bit of information or supposed information in the possession of the state, to which the bidder resorted in making the investigations which it was required to make. If it relied upon this paper, it did so at its own risk. The most it could ask for in regard to this information was good faith. We are of the opinion, therefore, that this claim was properly disallowed by the Appellate Division.

The remaining claim relates to pumping water from the site of the lock. For this work the contractor bid fifteen cents per million foot gallons. This lock was a structure some 418 feet long by 87 feet wide. The bottom was to be covered with concrete, laid under water. Then the sidewalls were to be built up with concrete " in the dry." To accomplish this the whole site, or that part where work was progressing, had to be surrounded in some way to prevent the entrance of water, and then the pumping begun and continued whenever leakage rendered it necessary. The appellant says, and we think correctly, that at the time the bids were made, the estimates, plans and specifications contemplated a single cofferdam, in connection with which a single pumping system might be installed. At least the evidence would support such an inference and it was so found by the Court of Claims. It is true that this finding was reversed by the Appellate Division, apparently on the ground that it was immaterial. As no finding to the contrary was made by that court, and as it dismissed the claim, the appellant may ask us to consider the testimony favorable to it.

The Erie canal passed this proposed new lock a few feet away, and after the work of constructing this coffer-

dam was begun it was seen that the safety of the canal might be endangered. The work was stopped and consultations had. In the contract the state reserved the right to make changes in the plans and specifications. Such changes were only to be made, however, with the consent and approval of the superintendent of public works and the state engineer, which approval must be evidenced by a writing, signed and filed with the state engineer and the canal board. If the change increased the expense it must also receive the approval of that board. Acting under these provisions the officials in question altered the plans so as to require the south wall of the lock to be constructed, much as the cut-off wall had been built, by a series of pneumatic caissons seven in number. As this change increased the expense of the work, it required and received the approval of the canal board. In the order given to the claimant requiring the change, figures were given showing the increase of concrete work that would result, and the decrease in certain other items, but no reference is made to the pumping, although the water had to be removed separately from each caisson. The south wall was built in this manner.

The claimant then began the north or river wall. There was discussion as to how this should be done and the contractor formulated a plan in regard to it. This was to use a series of eight cribs or boxes sunk to the proper grade on the river bottom. Each was then freed of water separately and filled with concrete. This plan was approved by the board of consulting engineers and also by the division engineer. The work was done as contemplated. But it does not seem to have been considered by any one such an alteration as is spoken of in the contract. There was no order, only permission. There was no consent or approval by the superintendent of public works. There was no writing filed with the engineer and the canal board.

Under the circumstances, whether this manner of build-

[233 N. Y. 177]      Opinion, per ANDREWS, J.      [April,

ing the north wall required a more expensive method of pumping seems to us immaterial. It resulted from no change of plans ordered by the state.

As to the south wall, however, we reach a different result. Whether the contractor advised the alteration is unimportant. It was in fact made. As a result it required seven distinct pumping operations instead of one, with an increased number of pumps and workmen, with separate installations and other items of expense. While the bid for pumping under the original plans may have been adequate, it may have been utterly inadequate if the work were done as the changes required by the state compelled it to be done. It would be inequitable to confine the bidder to a unit bid made to meet entirely different conditions. Nor are we required, as we are required with regard to the other items, to hold that such is the law. The bid price is inapplicable. The contractor may recover on a *quantum meruit* for the reasonable value of the work performed in freeing these seven caissons from water. (*Mulholland* v. *Mayor, etc., of New York*, 113 N. Y. 631; *Wood* v. *Fort Wayne*, 119 U. S. 312.)

The fact that the alteration order served on the claimant makes no mention of pumping does not change the situation. The order was not a contract. It states, for instance, that the change would require 8,800 additional yards of pneumatic caisson work. These figures would not bind the claimant. It is true the contract states that no change of plans which will increase the expense or create a claim against the state shall be made unless a written statement setting forth its amount and the expense thereof is assented to by the canal board. This cannot mean that when a change is ordered, compliance with which is obligatory, the estimates of amount and price made by the engineer estop the contractor. What may he do? He may protest and object, but he must comply. The provision is intended to give the board reasonable control over the expense to be incurred in alterations.

Having before it estimates of the probable cost, it may approve or disapprove. But where the work is done the contractor may not be deprived of compensation for 20,000 yards of excavation actually required because the estimate stated that but 18,000 yards would be needed.

The claim, therefore, should not have been dismissed. But as there is no finding and no concession as to the fair value of the work done in removing the water from the seven caissons on the south side of the lock, the judgment appealed from must be reversed and a new trial granted, with costs to abide the event, unless the parties stipulate as to the fair value of such work, in which case judgment may be entered for the amount so stipulated, with costs in all courts, and in other respects the said judgment of the Appellate Division is affirmed.

All concur in the opinion as to the first item mentioned therein except CARDOZO and CRANE, JJ., who vote to reverse the Appellate Division and affirm the Court of Claims as to the said item.

All concur in the opinion as to the second item mentioned therein except HOGAN, POUND and CRANE, JJ., who dissent.

Judgment accordingly.