THE ARTHUR A. JOHNSON CORPORATION, Plaintiff, *v.* THE CITY OF NEW YORK, Defendant.

Supreme Court, New York County, June 13, 1936.

*Nevius, Brett & Kellogg [Franklin Nevius* and *Asa B. Kellogg* of counsel], for the plaintiff.

*Paul Windels, Corporation Counsel [George H. Mitchell, Robert F. Wilson* and *Charles Blandy* of counsel], for the defendant.

SHIENTAG, J. The plaintiff, a subway contractor, is suing the city of New York to recover damages arising out of the construction of a subway under Manhattan avenue in Brooklyn. The complaint sets forth several causes of action based on various claims against the city, all of which were disposed of at the trial except the claim referred to as No. 5, covered by the second cause of action. This claim arose as the result of the increased cost of

excavation due to the presence in the soil of what is known as "hardpan." It is alleged that the presence of hardpan was not shown on supplementary drawing D-15, which sets forth the results of test borings made by a contractor employed by the city. It is further alleged that the plaintiff relied upon the drawings, that they furnished the basis of the bid it made, and that the board of transportation knew that the material to be excavated was different from that shown on the drawings.

Candor obliges me to say that when, at the conclusion of the trial, I summarized the evidence and reserved decision on questions of law involved, I labored under a misapprehension concerning certain portions of the testimony. The views that I then expressed concerning the facts must, therefore, yield to those set forth in this opinion after a careful examination of the record.

The contract was advertised for letting on December 16, 1927, and bids were received December 30, 1927. It is what is commonly known as a unit price contract; it provided different fixed unit prices for earth excavation and for rock excavation. Earth excavation included all materials of whatever nature encountered, including boulders and filled ground, except boulders whose volume within the ordered net lines of excavation was one cubic yard or more each. Such boulders were classified as rock excavation and payment provided as such. The contract specifically provided that the city did not guarantee the correctness or completeness of the borings.

Section 203 of the standard specifications reads:

" (a) In addition to the contract drawings mentioned in Section 2 of the Special Specifications, the Board has had prepared a set of maps and drawings, bearing the same seal and general title as the contract drawings, but designated as *Supplementary Drawings.* These supplementary drawings exhibit certain information which the Board has received from the Engineer and its boring contractor as to borings taken along portions of the route, the nature and position of surface railroads, monuments, water mains, gas and other pipes, sewers, electric subways, manholes, hydrants, catch basins and other surface, subsurface and overhead structures.

" (b) In addition to the information which is indicated by the supplementary drawings referred to, the Board has in its possession copies of certain old maps of the Borough of Manhattan which show topographical conditions in said Borough at the time of the preparation of said maps.

" (c) These supplementary drawings, maps, samples of materials taken in connection with test borings and certain information relative thereto may be seen at the office of the Engineer. They

are exhibited to the Contractor so that he may form his own judgment thereon and without any guarantee on the part of the Board as to their completeness or correctness. The Contractor may have copies (blueprints) of these supplementary drawings for such aid, if any, as may be derived from them on the payment of the cost of blueprinting."

Section 204 of the standard specifications and article VIII of the contract provide that the unit prices include all unforeseen difficulties in connection with the prosecution of the work.

Section 200 of the standard specifications provides as follows:

" Quality of Construction. (a) The Special and Standard Specifications and the contract drawings mentioned in the Special Specifications, taken in connection with the other provisions of this contract, are intended to be full and comprehensive, and to show all the work required to be done. But in a work of this character the soil and other conditions cannot be fully explored or determined in advance and it is therefore impossible either in advance to show all details or precisely to forecast all exigencies. The Special and Standard Specifications and the contract drawings are to be taken, therefore, as indicating the amount of work, its nature and the method of construction so far as the same are now distinctly apprehended.

" (b) The Contractor shall construct and complete the Railroad strictly in accordance with the requirements of these Special and Standard Specifications. If in these specifications or this contract or on the contract drawings any matter or thing requisite be not contemplated, mentioned, specified or indicated or otherwise provided for, nevertheless the same is deemed to be included and the Contractor shall do the same as part of the work hereunder at the unit prices for each class of work where, in the opinion of the Engineer, applicable or as provided in Item 150."

The city resists payment of the claim on the ground that it furnished to the plaintiff and made available to it all information in the city's possession, including contract drawings, supplementary drawings, inspectors' reports and the physical material (samples) referred to in the drawings; that the inspectors' reports reflected what they found at the scene of operation, and that the drawings, in turn, accurately and completely reflected the contents of the inspectors' reports. In other words, the city takes the position that it did not conceal any facts in its possession from the plaintiff and that it was not guilty of bad faith.

On the other hand, plaintiff argues that the reports of the inspectors were not accurate, that although they show that certain " wash borings " were made, no such borings were in fact made,

and that both the reports and the drawings failed to disclose the presence of hardpan, of the existence of which the inspectors knew or should have known, and that the knowledge of the inspectors is to be deemed the knowledge of the city.

It may fairly be found from the evidence that hardpan was not embraced within the contract definition of earth. Hardpan has been defined as a substance cementitious in character, a combination of impacted sand, gravel and clay. The substance has a significance well known to the city; it is distinguished from ordinary sand, gravel and clay, which is readily breakable although in combination. The distinction between hardpan and the ordinary combination of sand, gravel and clay was recognized by the city in connection with other borings not involved in this suit and in connection with other contracts.

On the basis of the record it is fair to assume likewise that the hardpan encountered was present when the borings were made in 1906 and in 1925. The thickness of the layers and their extent warrant this inference. The situation differs, therefore, from a case where water is encountered below the surface at a level other than that indicated on the borings, which discrepancy may be explained by artificial diversion caused by other excavating operations in the vicinity.

It is well-settled law that under a contract such as we have here, in which it is specifically stipulated that the city does not guarantee the completeness or correctness of the borings, or of the results thereof, the city is nevertheless liable if it knowingly misrepresents the conditions, or if it withholds from the contractor any material information of which the city had knowledge and which if disclosed would have tended to indicate the incorrectness of the boring sheets attached to the contract. In other words, implicit in a contract of the kind we are considering is the requirement that the city shall act in good faith. (*Foundation Co.* v. *State*, 233 N. Y. 177; *Rodgers & Hagerty, Inc.*, v. *City of New York*, 247 App. Div. 874; *Dunn* v. *City of New York*, 205 N. Y. 342; *Weston* v. *State*, 262 id. 46.) Whether that requirement has been met is determined by the same tests that would be applied if in place of the city an ordinary business corporation were involved. The city, on the point we are considering, is in the same position as any other corporation which necessarily has to act and to acquire knowledge through its officers and employees.

There is no basis for any finding of intentional misrepresentation on the part of the city. In fact the plaintiff makes no such claim. Did the city through its employees have knowledge of certain conditions in connection with the borings made on the site covered

by this contract which, if disclosed, would have indicated to the contractor that he might expect to encounter in the course of excavation, substances of a character different from those disclosed by the supplementary drawings?

Two sets of borings were made, the Healey borings in 1906 and the Osborne borings in 1925. Both were made by independent contractors employed and paid by the city. The Healey borings were set forth in the supplementary drawings attached to the contract. On those the contractor relied. The Osborne borings were not attached to the contract. Although the contractor may not be deemed to have relied on them, the city would not be relieved from liability if in fact, in connection with these Osborne borings, it acquired and withheld from the contractor information tending to put in question the accuracy of the earlier borings on which the contractor did rely.

A careful study of the record leads to the conclusion that plaintiff has failed to establish by credible, reliable, trustworthy testimony that the city, its inspectors or any of its officials or employees, knew of the existence of " hardpan " on that portion of the subway route on Manhattan avenue, Brooklyn, covered by the contract in suit.

As against the testimony of an employee of the Healey Company who gave his recollection of what was found when the borings were made in 1906, we have the written reports of Carr, the city inspector, made at the time the borings were made, which reports do not show that hardpan was found or that holes were abandoned because a hard substance was encountered which the casing pipe used in the wash boring could not penetrate. Supplementary drawing D-15 attached to the contract, which gives the results of the Healey borings, correctly reflects the reports of the inspector. There is no reason to discredit the reports of Carr. It is not claimed that he was actuated by improper motives. The question of his competency will be dealt with later. It appears that where holes were abandoned in other sections of the subway route Carr so noted on his reports, and where hard subsurface conditions were found on other sections it was likewise noted on his reports. The Osborne drawings likewise accurately reflected the reports of Gibbons, the city inspector. Those reports failed to show that hardpan had been encountered, although they did show a change of material at different grades. Moreover, the data used by the defendant's engineers in preparing the boring maps was available for examination by plaintiff as a bidder, a privilege of which it failed to avail itself. So much, therefore, for actual knowledge on the part of the city or its employees of subsurface conditions and substances other than those indicated on the boring plans.

The plaintiff argues that even if the city did not have actual knowledge of the existence of hardpan, that substance was actually present in the subsoil and extended over large areas; that if proper scientific borings had been made that condition would necessarily have been disclosed. It is urged, likewise, that if the city inspectors had made careful scientific observations as the borings progressed the existence of hardpan would have become known. It is the contention of the plaintiff, therefore, that in any event, whether the city or its inspectors actually knew of the condition, there is here present a degree of negligence on the part of the city that is tantamount to bad faith. (Cf. *Ultramares Corp.* v. *Touche*, 255 N. Y. 170.)

Under no circumstances may the negligence of the city be made the basis of liability in so far as the Osborne borings are concerned. Those borings were not included in the supplementary drawings attached to the contract, nor were they relied upon by the plaintiff in making its bid. It seems clear, likewise, that liability may not be predicated on the carelessness of the independent contractor alone; and this applies to both the Healey and the Osborne borings; otherwise the reservations in the contract which have been earlier set forth would be meaningless.

The remaining question is whether the city is liable notwithstanding the reservations in the contract because of the negligence of its inspector Carr in connection with the Healey borings. That the inspector did not have an adequate appreciation of the nature of the borings, of how they should be made and the significance of the results thereof, seems clear from the testimony. He was a civil engineer, to be sure, but apparently did not know very much about wash borings. To discover the existence of hardpan, as distinguished from ordinary sand, gravel and clay in combination, is not a simple matter. It requires experience and a rather high degree of skill and accuracy of procedure. I am of the opinion that the most that can be said here is, to paraphrase an expression used in one of the leading cases on the subject, that there was no bad faith; there was, so far as appears, an honest mistake on the part of the city's employee. (*Foundation Co.* v. *State*, 233 N. Y. 177, 185.) Even if we assume negligence on the part of the inspector it did not rise to that degree sufficient to brand it as the equivalent of fraud or bad faith.

The cases cited by the plaintiff are not holdings to the contrary. (*Stewart & Co.* v. *State of New York*, 121 Misc. 827; affd., 218 App. Div. 810; affd., 245 N. Y. 638; *Jackson* v. *State*, 210 App. Div. 115; affd., 241 N. Y. 563; *United States* v. *Atlantic Dredging Co.*, 253 U. S. 1; *Hollerbach* v. *United States*, 233 id. 165; *Christie* v.

*United States*, 237 id. 234; *Schumacher* v. *City of New York*, 166 N. Y. 103; *McGovern* v. *City of New York*, 202 App. Div. 317; affd., 235 N. Y. 275.) *Schumacher* v. *City of New York* (*supra*) is not in point. That was an action in negligence against the city for damage to the property of an adjoining owner. The ordinary rule with respect to notice in negligence cases was held to apply. In each of the other cases cited it appears that the governmental body involved made affirmative misrepresentations or had actual knowledge or information through its employees of the existence of conditions which were withheld from the contractor and which, if brought to his attention, would have put him on inquiry with reference to the accuracy of the boring plans or other data on which he relied in making his bid.

Whether or not it was prudent or advantageous for the city or the contractor to enter into an engagement with the reservations here present is not for the court to say. The parties decided that for themselves. The contract was freely made; both parties must abide by its terms. The contractor had the right to make an independent examination. If it felt that time was too limited for that purpose it could have refrained from bidding. But it chose to take its chances. It accepted the risk. It can hardly with good grace protest that the hazard turned out to be greater than it anticipated. It cannot now be heard to complain because the event belied its expectation. On the good faith of the other contracting party it had the right to rely. For misrepresentation, for concealment, it may have redress. But honest mistake, unavoidable or careless, comes within the orbit of the risk he assumed.

To avoid, if possible, the necessity of a retrial if the conclusions here expressed should be held to be erroneous, I shall make some additional findings:

1. The engineers of the city were fully aware that hardpan, extending over large areas, was encountered in the course of excavation. The formal claim was not filed until much later, but it was timely, because the plaintiff was in no position to file such claim until it discovered the alleged dereliction on the part of the city.

2. If the plaintiff should ultimately be held to have established liability on the part of the city in connection with the claim here being considered, the plaintiff is entitled to recover on such claim the sum of $132,934.17, the actual difference in the cost of excavation, with interest thereon from the date of the service of its claim. October 1, 1931.

The case is one which, so far as damages are concerned, comes within the rule laid down in *Jackson* v. *State* (210 App. Div. 115; affd., 241 N. Y. 563); *Pilkington Co., Inc.*, v. *City of New York*

(211 App. Div. 558; modfd., 216 id. 756; affd., 243 N. Y. 638); *Matter of Shaddock* v. *Schwartz* (246 id. 288), and *McGovern* v. *City of New York* (202 App. Div. 317; affd., 235 N. Y. 275).

As has previously been stated, the other claims of the plaintiff were disposed of on the trial. Settle order providing for judgment in accordance with the disposition made at the trial and in accordance with this opinion in so far as it relates to the second cause of action. Interest on the amount of the various claims allowed should be computed to date. Appropriate exceptions will be allowed to the respective parties. Thirty days' stay of execution and sixty days to make a case.