ROCELL CONSTRUCTION Co., INC., et al., Claimants, v. STATE OF NEW YORK, Defendant. (Claim No. 31844.)

Court of Claims, January 4, 1955.

*Edward F. Layden* for claimants.

*Nathaniel L. Goldstein, Attorney-General (Lawrence H. Wagner* of counsel), for defendant.

LAMBIASE, J. On or about November 9, 1950, claimants entered into a contract with the State of New York, the latter acting by and through its Department of Public Works, for the construction of a portion of North Goodman Street, a length of 0.03 miles, which constitutes contract SSC 50-7, and for the construction with Federal aid of a portion of North Goodman Street, a length of 0.75 miles, and the North Goodman Extension, a length of 0.86 miles, a total length of 1.61 miles, which constitutes contract FASS 50-8, a total combined length of 1.64 miles in the County of Monroe, New York as set forth in Exhibit 3 and as shown in the plans.

The contract provides, among other things, for the construction of a sewer beneath the proposed pavement approximately between stations 1+89 and 31+04. Prior to preparing and submitting their bid for said contract, Alvin Petrossi, secretary and treasurer of claimant A. E. Petrossi, Inc., and Romolo Celli, president of Rocell Construction Co., Inc., visited the office of the district engineer of the New York State Department of Public Works in the city of Rochester, New York, which office was in charge of the execution of the work under the proposed contract. There they examined borings and soil test findings pertaining to the contract site. These borings and soil test findings had been made in 1947 by the State of New York and had been made at a point about 20 feet to the left or west of the center line of the existing right of way and more particularly at stations 24+50 and 12+00 of the contract site. (Exh. 10.) The borings at both of these stations were made to a depth of 15 feet below the natural grade. The report of said borings indicated that no rock was found above the fifteen-foot depth at said stations. When Alvin Petrossi aforesaid examined Exhibit 10, he did **not notice that the borings had been made 20 feet to the left or**

west of the center line of the highway right of way, and he assumed that they had been made on the center line thereof. Mr. Romolo Celli, however, at the time that he examined the borings noted and was fully aware of the exact place of the borings as shown on Exhibit 10.

Claimants testified that they assumed that there would be no rock in the excavation for the sewer, and that they prepared and submitted their bid on the basis of such assumption. (S. M. 21-25, 70.)

After the making of said contract and on December 4, 1950, claimants commenced their work thereunder. During the course thereof, and particularly through trench excavation operations undertaken from March 9, 1951, until August 22, 1951, and generally between stations 1+89 and 31+04, they found rock present within required excavation depths. They protested continuation of their work — in the presence of said rock — at the unit price of $1.40 per cubic yard, the price bid by them for excavation under Item 5 — " Trench, Culvert and Bridge Excavation " (Exh. D, " Public Works Specifications " of Jan. 2, 1947, p. 194, and Itemized Proposal, p. 3, Exh. 3), but were required to by the State of New York, its officers and employees, and they did continue with the contract.

The claim alleges: " 8. That the aforesaid borings and soil tests purported to have been made by the State of New York were negligently and carelessly made and the purported records and findings thereof exhibited to claimants were inaccurate and misleading, whereby claimants were wrongfully induced to enter into said contract in the manner aforesaid." And it is further alleged therein: " 9. That by reason of the matters aforesaid claimants were wrongfully compelled to expend large sums of money for labor, equipment and materials in excavating the aforesaid trench and removing rock therefrom and were thereby also greatly delayed and interfered with in the prosecution of the progress of their construction work and in the completion of their entire contract. That after credit and allowance to the State of New York for $1.40 per cubic yard for excavation in the aforesaid trench claimants also sustained damages on account of the foregoing, amount to the sum of $42,448.03." The claim as filed also sets forth the following cause of action: " 10. That on or about March 11, 1953, the State of New York submitted to claimants the proposed final estimate, dated November 12, 1952, wherein the State included on quantities of work performed and materials placed the contract prices, and set forth and conceded that at such contract prices there remained a final

estimate due and payable to claimants in the sum of $19,071.82, which estimate claimants signed under protest in reservation of right to file this claim. Claimants claim herein from the State of New York the set sum of $19,071.82, with interest thereon, in addition to all other claims herein."

However, subsequent to the filing of the claim and prior to the trial, claimants accepted the final estimate figure of $19,071.82 for the cause of action alleged in paragraph 10 above set forth, and that cause of action in the amount represented by the final estimate was severed and the amount thereof was awarded and paid to claimants. However, the payment and receipt of said sum was " without prejudice to claimants' rights, if any, to recover interest thereon upon the trial of the remaining claims alleged in the notice of claim " and was " without prejudice to the rights of any of the parties herein to raise any issue or defense pertaining to the allegations of the notice of claim untried and undetermined." (Judgment dated June 11, 1953, entered in office of the clerk of the N. Y. State Ct. of Claims.) There was litigated, therefore, before us only the matter of the reserved interest hereinabove mentioned; and the demand for the sum of $42,448.03 (par. 9 of the claim), and as to that claimants' position is that " Either the test borings at Station 12+00, the findings of which Claimants' Exhibit 10 is purportedly a report, were not in fact taken by the State of New York, or if taken, the results and findings of these test borings were not truthfully and in good faith set forth in the report which is in evidence as claimants' Exhibit 10." (Claimants' proposed finding No. 26); and that the borings report (Exh. 10) failed to disclose the presence of rock, the existence of which the State of New York, its officers and employees, knew or should have known, and that knowledge of its employees is to be deemed knowledge of the State. In short, the State is charged with bad faith.

The State of New York, on the other hand, contends that it did not conceal from claimants any facts in its possession with reference to subsurface conditions at the location of the borings; that it was not guilty of bad faith in its dealings with claimants; and that the encountering of rock by claimants in their trench digging operations and other subsurface operations is part of the risk which the contractor assumed.

In the contract papers, Exhibit 3, " Information for Bidders ", there appears, among other things, the following:

" No Misunderstanding. The attention of persons intending to make proposals is specifically called to Article 3 of the Agree-

ment wherein the bidder agrees that he has examined the contract documents and the site of the work and has fully informed himself from his personal examination of the same regarding the quantities, character, location and other conditions affecting the work to be performed, including the existence of poles, wires, pipes and other facilities and structures of municipal and other public service corporations on, over or under the site, and that he will make no claim against the State by reliance upon any estimates, tests or other representations made by any officers or agent of the State with respect to the work to be performed under the contract. Particular attention is called to the proposal forms which may contain special notes and special specifications at variance with standard plans and specifications.

" Borings. Whenever subsurface borings or other subsurface information obtained by the Department is available for a bidder's inspection, it is understood that it has been obtained with reasonable care and recorded in good faith with reasonable interpretations placed on the results and character of materials and conditions to be expected. The bidder must interpret this information according to his own judgment and not rely upon it as accurately descriptive of subsurface conditions which may be found to exist. The information is made available to the bidder only in order that the bidder may have access to the identical information available to the Department."

The foregoing also appears in the " Public Works Specifications " of January 2, 1947, Exhibit D.

Also in the " Contract Agreement " part of the contract papers herein (Exh. 3), there is provided, among other things, the following:

" Article 2. Documents Forming the Contract.

" The Contract (and Contract Documents) shall be deemed to include the advertisement for proposals; the contractor's proposal; the agreement; the 'Public Works Specifications' referred to above; the plans; any addenda to specifications if the same are issued prior to the date of receipt of proposal, and all provisions required by law to be inserted in the contract whether actually inserted or not.

" Article 3. Examination of Documents and Site.

" The Contractor agrees that before making his proposal he carefully examined the contract documents, together with the site of the proposed work, as well as its surrounding territory, and is fully informed regarding all of the conditions affecting the work to be done and labor and materials to be furnished for

the completion of this contract, including the existence of poles, wires, pipes and other facilities and structures of municipal and other public service corporations on, over or under the site, and that his information was secured by personal investigation and research and not from the estimates or records of the Department, and that he will make no claim against the State by reason of estimates, tests or representations of any officer or agent of the State."

The report of the borings (Exh. 10) furnished by the State of New York was not part of the contract or of the contract papers herein. " It formed no part of the plans upon which the contract was based. It was not prepared or used for that purpose. It was an independent bit of information or supposed information in the possession of the state, to which the bidder resorted in making the investigations which it was required to make." (*Foundation Co.* v. *State of New York*, 233 N. Y. 177, 186.) What was said in *Johnson Corp.* v. *City of New York* (162 Misc. 665, 669, affd. 251 App. Div. 811), it seems to us is applicable here: " It is well-settled law that under a contract such as we have here, in which it is specifically stipulated that the city does not guarantee the completeness or correctness of the borings, or of the results thereof, the city is nevertheless liable if it knowingly misrepresents the conditions, or if it withholds from the contractor any material information of which the city had knowledge and which if disclosed would have tended to indicate the incorrectness of the boring sheets attached to the contract. In other words, implicit in a contract of the kind we are considering is the requirement that the city shall act in good faith. (*Foundation Co.* v. *State*, 233 N. Y. 177; *Rodgers & Hagerty* v. *City of New York*, 247 App. Div. 874; *Dunn* v. *City of New York*, 205 N. Y. 342; *Weston* v. *State*, 262 id. 46.) Whether that requirement has been met is determined by the same tests that would be applied if in place of the city an ordinary business corporation were involved. The city, on the point we are considering, is in the same position as any other corporation which necessarily has to act and to acquire knowledge through its officers and employees."

Did the State of New York, through its employees, have knowledge of certain conditions in connection with the borings made on the site covered by this contract which, if disclosed, would have indicated to the claimants that they might expect to encounter in the course of the excavation substances of a character different from that disclosed by the borings reported in

Exhibit 10? Did the State of New York, through its employees, act in good faith in its dealings with claimants?

Exhibit 10 (borings report) on which claimants relied formed no part of the contract papers or of anything incorporated by reference in said papers. Although claimants may not be deemed to have relied on the borings, the State of New York would not be relieved from liability if in fact, in connection with said borings and with said report it acquired and withheld from claimants information tending to put in question the accuracy of said borings and of said report. (*Johnson Corp.* v. *City of New York,* 162 Misc. 665, affd. 251 App. Div. 811, *supra.*) The record leads us to the conclusion that claimants have failed to sustain their burden herein of establishing by a fair preponderance of the credible evidence that the State of New York, its officers and employees, knew of the existence of rock on that portion of the contract site where the borings were made or where rock was actually encountered.

It is urged by claimants that the findings made at the rock test pit which they dug on the contract site at station 12+00 on or about May 18, 1951, sustain their position with reference to the alleged bad faith of the State of New York. Rock was encountered at said test pit at a depth of 13.80 feet below grade. (Exh. 32, booklet showing entry dated May 18, 1951.) However, the exact location of said test pit at station 12+00 has been variously testified to. It was first testified for claimants by their superintendent on the contract, Fred P. Celli, as follows: " Q. Mr. Celli, you say you went back there with the backhoe and you scooped that out, now, did you do your excavation at Station 12 in the center line? A. We dug a hole about 10-foot square, and the excavation started approximately in the center, that's right. Q. Then the outer ends of your excavation there would be approximately five feet from the center? A. That's right. Q. What? A. Five feet from the center, that's right." (S. M. 104 to 105.) Later he also testified as follows: " Q. Well then, the center line of the hole that you dug was 10 to 12 feet west of the center line of the excavation, is that what you are saying? A. That's right." (S. M. 326.) Mr. Thomas F. Stallman, project engineer on the contract for the State of New York, in answer to a question as to where the test hole was with relation to the center line of the sewer trench excavation, testified for the State of New York: " Q. Where was that hole with relation to the center line of the trench excavation? A. I would say that it straddled the center line and rested somewhat to the left of

the center line. Q. The opening was across the center line of the trench excavation? A. It was.'' (S. M. 395.) And upon cross-examination, he testified that definitely the center line of the test hole, as dug by claimants, was not at least 10 feet to the left of the center line of the excavation. (S. M. 423–424.)

Whatever else may be said of said testimony, it does not appear therefrom that the rock test pit was dug, at, or that any part thereof actually reached, the point of the boring, viz., 20 feet west of the center line of the highway right of way reported on Exhibit 10. Such evidence does not establish that there was rock at said point. Therefore, unless we infer that — because of the testimony of claimants' witnesses that the rock found in the sewer excavation, in the rock test hole, and in the area of the contract site is of a limestone type which characteristically runs level and constant insofar as the grade elevation of the top thereof is concerned — there was or must have been rock 20 feet west of the center line of the highway right of way at station 12+00 because there was rock at the test pit some distance to the east of said point, the presence of rock at said point 20 feet west of the center line of the highway right of way at station 12+00 has not been established. We do not feel justified in making said inference.

Furthermore, to sustain claimants' allegation of bad faith, assuming *arguendo* that we were to infer that because rock was found at some point west of the center line of the sewer excavation it also existed at the point where the State's boring was made at station 12+00, we would then have to infer further either that the boring reported to have been made by the State at that point was never made in fact, or that the boring having in fact been made, the report thereof did not truthfully set forth the findings of the boring operation. We are unwilling to make said inferences, and we find that there is no basis therefor. In fact, upon this record even if there were evidence to sustain a finding that rock existed at the point where the State's report indicates there was none, it would not necessarily indicate bad faith on the part of the State of New York, but could be equally as well the result of honest mistake, unavoidable or careless.

To further support their theory that rock actually existed at station 12+00 and at the point thereat indicated by Exhibit 10, and their charge of bad faith, claimants point to a conversation had by claimants' Mr. F. Celli with a Mr. Mulligan, State district engineer upon the job, who had died prior to the time of the trial, in which conversation we are told that we find the motive for the withholding of the information concerning the rock.

Mr. Celli asked about the rock on the job and stated: " ' I cannot understand, Mr. Mulligan, that there wasn't any rock item on this job.' " (S. M. 112.) Mr. Celli testified further concerning Mr. Mulligan: " He started to laugh and he says, ' Well — well, sometimes on jobs of this type where there is Federal aid involved — ' he says, ' — an item such as rock is a ticklish thing, and if they show a quantity of rock they might throw the darn thing right out, because it costs too much money.' " (S. M. 112–113.) There is no contradiction of said conversation. However, in our opinion, it does not establish that such was the case on this contract.

Claimants had the right to make an independent examination of the contract site; and in that connection we are told that while claimants did examine the contract site, they were unable to see any surface indications of rock in the area. Furthermore, they urge that they did not have an opportunity to make borings of their own. We are not satisfied that such an opportunity was not available to claimants. At any rate, upon this record we cannot and we do not say that the legal efficacy of the provisions of that part of the contract papers entitled " Information for Bidders " (Exh. 3) has been overcome by said testimony of alleged lack of opportunity. It would seem that with the knowledge of subsurface conditions which claimants' officers and employees testified that they had of the general area in and about the contract site, which knowledge indicated to them the presence of rock, they should have and could have made borings before the bid was submitted.

" The sovereign can contract and has very many occasions to do so; it can build canals and public buildings, and engage in public works, and in carrying forward its projects it makes use of the instrumentalities which individuals use for the same purposes. It must be governed by the same rules of common honesty and justice which bind individuals." (*Danolds* v. *State of New York,* 89 N. Y. 36, 44.) It may be fairly found from the evidence that rock was not embraced within Item 5 of the itemized proposal; and basically what claimants are attempting to recover herein is extra compensation on account of encountering difficulties which have not been provided against in the contract. When no claim of deception, inequality, or inequity is presented, a contractor is bound by the terms of his contract. Justice and equity do not require the State to reimburse a contractor for increased expense unless the mistake was due to the act of the State. (*Weston* v, *State of New York,* 262 N. Y. 46.)

Whether or not it was prudent or advantageous for claimants to enter into this contract with the reservations present and under all the conditions and circumstances prevailing is not for us to say. The parties decided that for themselves. The contract was freely made; both parties must abide by its terms. Claimants accepted the risk. It is unfortunate that the hazard turned out to be greater than they had anticipated. On the good faith of the other contracting party, claimants had the right to rely. For misrepresentation and concealment they may have redress; but honest mistake, unavoidable or careless, comes within the orbit of the risk assumed. (*Johnson Corp.* v. *City of New York,* 162 Misc. 665, affd. 251 App. Div. 811, *supra.*)

We conclude, therefore, that claimants have failed to establish a cause of action against the State of New York, and that the claim herein must be and hereby is dismissed upon the merits.

In view of our conclusion herein we do not deem it necessary to discuss claimants' alleged damages. We have stated herein only the facts which we deem essential to our conclusion of dismissal herein. (Civ. Prac. Act, § 440.)

Let judgment be entered accordingly.

RYAN, J., concurs.