PUBLIC CONSTRUCTORS, INC., Respondent, v STATE OF NEW YORK, Appellant. (CLaim No. 52054.)

Third Department, January 20, 1977

*Louis J. Lefkowitz, Attorney-General (Richard J. Dorsey* and *Ruth Kessler Toch* of counsel), for appellant.

*Berman, Paley, Goldstein & Berman (David R. Paley* and *Murray Tim Berman* of counsel), for respondent.

GREENBLOTT, J. This is an appeal by the State from an award in favor of the claimant in the amount of $1,988,527.04 (on the second through sixth and ninth causes of action), plus interest. Claimant and the State entered into a highway construction contract dated November 10, 1965 for the construction of a portion of the new Route 17 in Delaware County. The contract provided for the construction of 5.68 miles of main road, 7.72 miles of access road and four bridge structures. The contract plans were formally approved and accepted by appropriate State officers on September 21, 1965. The contract was advertised for bids in early October, 1965, and final bids were received during the latter part of that same month. Claimant as low bidder was awarded the contract on November 10, 1965 and began work on or about December 20, 1965. The amount of claimant's bid was $11,856,562.50. The contract was accepted as complete by the State on January 15, 1969. Claimant thereafter filed a timely claim asserting nine causes of action based on alleged breaches of contract by the State. This appeal involves causes of action two, three, four, five and nine. (The awards in the first and sixth causes of action are not challenged.)

The elements underlying the second cause of action attributed by claimant to the State are, *inter alia,* as follows: material changes and alterations in the nature, quality and extent of work; numerous changes in design of the work and consequent delays in preparation of the plans; furnishing inadequate and misleading information to bidders which failed

to fairly represent the conditions at the site; negligence in the preparation of the design of the project; knowingly witholding relevant information concerning conditions at the contract site; unreasonable delay in approving shop drawings and in making necessary decisions.

The basic element underlying claimant's allegations relate to its contention that wet subsurface soil conditions completely disrupted its excavation and embankment operations, and that when deep cuts were made, fill areas were not sufficiently extensive to permit the placing of excavated material in required thickness of layers to dry out, and therefore when excavated material was wet, claimant was compelled to cease operations, resulting in extensive delays. Liability is said to attach to the State because in disclosing information to bidders as to soil conditions on the site, the State is alleged to have provided incorrect and misleading information indicating that subsurface soil consisted primarily of coarse grained material which has the capacity to shed moisture, whereas in fact the subsurface soil consisted primarily of fine grained materials lacking the capacity to permit compaction in moist conditions, and that conditions of excessive moisture were present which the State failed to disclose. The effect of encountering these unanticipated conditions was to require claimant to increase the scope and number of drainage structures and to change its earth work operations and alter procedures and plans for construction in light of the embankment problems which it encountered which were not envisioned or disclosed by the contract documents. The State takes the position that adequate information was provided in the material furnished to bidders, and that claimant itself must bear the responsibility for not being aware of the conditions because of its failure to conduct adequate prebid, on site investigations. It is further claimed that the State is excused from liability by virtue of a provision in the contract advising bidders that they were not entitled to rely upon the accuracy of descriptions of subsurface conditions contained in bidding documents.

. The Court of Claims fixed liability upon the State, and we concur in rejecting the State's aforementioned contentions. Dealing first with the alleged exculpatory provisions in the contract, it is pertinent that the provision in the public works specifications of January 2, 1962 applicable to this contract specifically provided as to borings that the "information is

made available to the bidder only in order that the bidder may have access to the identical information available to the Department." The record establishes however that identical information was not in fact made available to bidders.

In 1952 and 1953, many years prior to the letting of this contract the State began subsurface soil explorations along the contract site by retaining private contractors to make test borings. The findings of these contractors were transcribed into boring logs and forwarded to the State's Soils Bureau in Albany. The Albany bureau also made its own on site investigations in 1952, and in 1956, seismic tests were conducted on the site. In 1962, the State through its Binghamton field office of the Department of Public Works resumed further on site soils explorations; these being mainly the taking of 145 test borings. Analyses of these test borings were prepared by the unskilled field workers and compiled. (This compilation is referred to as the "Binghamton borings".) At the same time samples were inspected by skilled technicians at the Albany Soils Bureau in 1963 whose findings were written up and became known as the Albany laboratory logs. The essence of the credible testimony, leading to findings of the trial court with which we concur as being supported by a preponderance of the evidence leads to the conclusion that the 1952-1953 borings and the Albany laboratory logs which were not released to claimants or to the engineers charged with designing the project, presented a considerably different picture of the contract site than did the Binghamton field borings, which, in addition to presenting information tending to indicate far fewer problems, appear to have been prepared by untrained staff members who failed to comply with the State's own specifications for recording the information.

It would serve no useful purpose for this court to further elaborate upon the conflicting contentions of the parties regarding the question of whether or not the Binghamton borings were misleading, and whether substantial and extensive changes in the method of construction resulting in delays were caused by the fact that claimant ultimately encountered conditions far different than those which it had been led to anticipate. On these questions, we are of the view that the findings of fact of the Court of Claims are substantially supported by the record and should be affirmed and we refer to the decision of said court for a more detailed discussion of the facts.

The applicable law, in our view, clearly supports a determination fixing liability upon the State. In *A. S. Wikstrom, Inc. v State of New York* (52 AD2d 658, 660), we said: "In *Rusciano Constr. Corp. v State of New York* (37 AD2d 745, 746, mod 37 AD2d 789), one of the questions involved the State's failure to make available all soil testing information and to provide in the contract plans for the possibilities of unstable subsurface material which contributed to a delay in completing the project. We held that 'the exculpatory clauses in the contract and in the invitations to bid do not insulate the State from liability where the conditions are not as represented in the contract and inspection by the contractor would not reveal the representations to be false.' In *County Asphalt v State of New York* (40 AD2d 26) we applied this reasoning. Additionally, in *Warren Bros. Co. v New York State Thruway Auth.* (34 AD2d 97, 99, ·affd 34 NY2d 770), we said: 'In a construction contract between the State and an individual, which contains representations as to existing conditions affecting work thereunder as well as an exculpatory clause relieving the State of liability and requiring personal inspection of the contract site, liability, nevertheless, may attach to the State if said conditions are not as represented and (1) inspection would have been unavailing to reveal the incorrectness of the representations *(Foundation Co. v State of New York,* 233 N. Y. 177, 184–185; *Faber v. City of New York,* 222 N. Y. 255, 260), or (2) the representations were made in bad faith *(Young Fehlhaber Pile Co. v. State of New York,* 265 App. Div. 61; *Jackson v. State of New York,* 210 App. Div. 115, affd. 241 N. Y. 563)' ".

In our view, the Court of Claims was clearly correct in finding that the contract documents furnished to the bidders contained misrepresentations, and in rejecting the State's contention that claimant must bear the responsibility as the result of an inadequate prebid investigation. With regard to the latter point, we again refer to the findings in the decision of the Court of Claims, and also point out that bidders could not reasonably have been expected to discover in a period of approximately three and one-half weeks the kind of information which the State possessed, after testing for that information over a period of many years.

We have examined the remainder of the State's contentions pertaining to the issue of liability on the second cause of action, and except as regards specific issues which will be dealt with hereinafter, we reject them.

In making these findings, we have determined that the State was not responsible for all delays and other problems which were encountered in this contract and which relate to the second cause of action. The Court of Claims was obviously of a similar view in that with regard to many elements of its award it reduced the full damages in the amount of 10%. We agree that certain delays were the responsibility of the claimant or were beyond the control of either party. However, we find no factual basis in the decision for an apportionment of damages on a 90%-10% basis as determined by the Court of Claims.

We find that there is sufficient evidence in the record to permit us to make new findings on the apportionment of liability. "Obviously, it is impossible to allocate specific amounts of damages to each item of interference or delay. The impossibility of establishing a precise formula for computing damages should not foreclose the claimants' clear right to recover. *(Westcott v. State of New York,* 264 App. Div. 463.)" *(Rusciano Constr. Corp. v State of New York,* 37 AD2d 745, 747, *supra.)*

Recognizing the difficulties in apportionment of damages here, we feel the award should be based on a 70%-30% apportionment in the interests of justice based on evidence indicating, amongst other things, the following: (1) claimant used worn sheepsfoot rollers which did not meet minimum pressure specifications; (2) claimant did not properly ditch, drain or crown certain embankments; (3) when claimant's earth work supervisor died, the replacements were relatively inexperienced; (4) heavy rains contributed to the slowdown of earth work operations.

There is no need for a further discussion of the evidence indicating the presence of these factors or of other circumstances which increased the cost of claimant's performance, but which were not caused by the State. In any event, none of these items are sufficient, even if taken together, to fully relieve the State of liability.

Therefore, on the basis of the 70%-30% apportionment heretofore found to be applicable, the awards under the following four items under the second cause of action are modified, as follows:

(a) "Additional Cost of Excavation and Embankment", reduced to $468,970.60;

(e) "Cost of Bridge Supervision" reduced to $12,212.90;

(i) "Additional Cost of Structure Excavation" reduced to $56,586.60;

(j) "Additional Cost of Trench and Culvert Excavation" reduced to $31,076.50.

With regard to items 2 (f) "Cost of Supervision, Indirect Labor and Equipment After December 15, 1967" in the amount of $235,353.27 and 2 (g) "Cost of Field Expenses After December 15, 1967", in the amount of $21,500.31, it appears that the Court of Claims premised this award upon its finding that but for the State's actions claimant would have completed the project on or before December 15, 1967, well before the contract completion date of August 1, 1968.

The original progress schedule showed a completion date of August 1, 1968, the contract completion date. It indicates that certain portions of the contract were to be performed in 1968.

Claimant argues that the approved progress schedule showed that all of the main line expressway, all of the concrete paving and all of the bridges would be completed by December 15, 1967 and the only work shown to be performed in 1968 was certain miscellaneous work on existing Route 17. This Route 17 work was actually performed and finished in 1967. The problem with this argument is that claimant is attempting to make an artificial distinction between main line work and Route 17 work. Such a distinction is not properly made since this is not a series of independent contracts but rather one integrated project.

Furthermore, it would not be proper to allow claimant to divide the contract up, insofar as the progress schedule was concerned but not insofar as the earth work progress. We also note that when claimant presented its second cause of action, it did not treat the main line and Route 17 as separate projects but went on at great lengths about problems on Route 17. We therefore conclude that the award under items 2 (f) and 2 (g) should be reduced so as to allow recovery under these items only of such an amount as is attributable to performance after August 1, 1968. Upon our review of the evidence, and after application of a 70%-30% apportionment, we find the proper amount of damages to be $64,174 under item 2 (f) and $8,995 under item 2 (g). The awards for these items will accordingly be reduced to these amounts.

This leaves for discussion in the second cause of action the

awards for items (b) "Haul Road", (c) "Borrow", (d) "Cost of Premium Time", and (h) "Additional Cost of Materials for Bridge Construction". Items (c) and (h) were found to be awardable without any allocation and we affirm the award of these items in the respective amounts $11,278 and $29,332.

The award for item (b), however, in the amount of $130,771 must be reversed. This award represents claimant's cost of negotiating the rights for and building of a haul road on private property when it was found that a viaduct which was to be constructed as part of the project was delayed. Upon review of the record, we reject the findings of the Court of Claims and make alternative findings as follows. Claimant in the course of preparing its bid clearly anticipated the use of a "temporary haul road" in the viaduct area. The award must be overturned since it is premised upon testimony that the unavailability of the viaduct was anticipated in April of 1966, prompting the claimant to negotiate for the use of the haul road in May of 1966. We find as a fact that the construction problems with regard to the viaduct did not arise and could not have been anticipated prior to June and July of 1966, and we therefore conclude that in undertaking expenditures with regard to the haul road, claimant acted independently and not out of necessity to respond to delays resulting from breaches of contract by the State.

The State also objects to the award for item (d) of $325,246 to claimant as the cost of premium time. This was awarded by the trial court as a lump-sum accumulation of nearly all of the premium time paid on the contract. This award must be reversed as it is not supported by any evidence within the record. The trial court accepted *in toto* claimant's schedule and awarded as damages all premium time paid on the contract. It appears that claimant went through its payroll journal and listed all premium time paid, week by week by classification of labor throughout the project and charged all of it to the State. Claimant has made no showing that the premium time was a response to a State-caused breach.

This brings us to causes of action three, four and five, all of which resulted in awards attributable solely to the fact that claimant remained on the project after December 15, 1967. For reasons heretofore indicated, the recovery under these three causes of action must be reduced so as to allow recovery only of such damages as are appropriate when measured against a contract completion date of August 1, 1968. In the

case of causes of action three and four, moreover, a 70%-30% apportionment will again be applied. The award for cause of action five is determined by prorating the damages as found by the trial court to reflect an award for 15 days rather than for eight months. Upon review of the evidence, we find that the amounts to which these awards should be reduced are $1,553 under cause of action three, $1,737 under cause of action four, and $312.50 under cause of action five.

This brings us to a discussion of the ninth cause of action, which was based on the alleged damages suffered by claimant's steel subcontractor, United States Steel Corporation, American Bridge Division (hereinafter referred to as American Bridge), as a result of the State's breaches of the construction contract. Claimant alleges that the State's various acts and omissions under the second cause of action forced American Bridge to perform its work in an inefficient and uneconomical manner and that portions of this work had to be performed during the winter rather than as originally planned in the summer and fall. American Bridge had the subcontract for the fabrication and erection of the steel for the bridges.

Prior to April 25, 1966, the State discovered that the steel designs for bridges 1, 2 and 4 were faulty. These designs had been made by the State's consulting engineers, McFarland-Johnson. When the State discovered that the plans for the bridges had to be redesigned, it became necessary to review American Bridge's shop drawings. The State made revisions in the shop drawings in a piecemeal fashion and did not adequtely explain its revisions to American Bridge. Furthermore, the revisions were extensive and the shop drawings had to be drastically altered. American Bridge prepared new shop drawings based on revisions directed by the State. Because of designing defects, a substantial number of these drawings had to be revised and resubmitted to the State for ultimate approval. Until the revised shop drawings were approved by the State, no fabrication of any of the girders or cross frames could be undertaken. As to bridge 1, on August 8, 1966 all of the shop drawings were approved and fabrication of bridge 1 could proceed. As to bridges 2 and 4, some of the fabrication could commence on August 8, 1966 and all of the drawings were approved by January 26, 1967.

The filed progress schedule indicated that steel erection was to be performed from July through November, 1966. The

claimant had scheduled the structural steel erection to run from June, 1966 to the middle of October, 1966, and American Bridge had planned to fabricate the steel in the months of April through July, 1966. Fabrication of steel for bridges 1, 2 and 4 took place in American Bridge's Trenton, New Jersey, plant and fabrication of the steel for bridge 3 occurred in American Bridge's Elmira, New York, plant. The fabrication based on revised drawings for bridges 1, 2 and 4 was actually performed during October, 1966 through March, 1967.

The trial court found that the State was responsible for correction of the design errors. The State does not dispute this finding and concedes that its action caused an approximate four-month delay in American Bridge's fabrication schedule. The State contends, however, that, with the exception of the award of $54,883 under item (c) for "Direct Costs for Redesign Work", the various awards under the ninth cause of action are speculative or otherwise improper.

Except for the two instances hereinafter indicated, we do not find that the awards of damages under the ninth cause of action are either too speculative or improper in the manner of determination so as to require reversal or reduction for reasons hereinafter stated.

Under item (a), the Court of Claims made an award of $114,098 for loss of fixed plant overhead at American Bridge's Trenton fabricating plant. Based on projections of fixed expenses, forecasts of monthly production schedules were allegedly prepared. Testimony was introduced as to the production forecasts for the period April through July of 1966, when fabrication for the bridges was supposed to take place; testimony was also introduced as to the amounts by which production in these months actually fell short of projections after additional orders had been obtained to make up for some of the losses caused by the delay in fabrication of the steel for the job in question.

An analysis of the evidence reveals that it is based substantially on speculation. Claimant's witness, Mr. Collins, who was not involved with preparing the projections, was unable to reveal how the "required" production figures were actually arrived at by the Pittsburgh office. Furthermore, there was no proof offered that the Trenton plant had met its forecasted production in periods prior to April, 1966. The only period used for comparison was the period when actual production for the bridges was performed. Collins did state that in the

period of 1966-1967, when the Public Constructors' job was actually produced, two months were in excess of the required production and four months were under the required production. A close analysis of this item of the damages reveals how speculative it is. Exhibit 165 is based on the assumption that the loss of the Public Constructors' fabrication work in April, 1966 through July, 1966 was the exclusive cause of the Trenton plant's failure to meet the "required" production for that period. It is worthy of note that the loss of production figures provided for May and June of 1966 are the same as the deficit figures for the two months in 1966 in which there were deficits even though fabrication for this job was in progress. The claimant failed to offer any proof that in periods unaffected by the subcontract with Public Constructors the Trenton plant actually did achieve its "required" production. Therefore, this award is based on speculation that the delay caused the Trenton plant to fall short of its "required" production even though there is no proof that the plant ever, in fact, consistently achieved its required output. This award of damages for the loss of fixed overhead has no evidence to support it since there is no evidence as to the basis for the setting of "required" production figure. The award under item (a) is therefore reversed.

Under item (b), the trial court awarded the claimant $54,637 for loss of efficiency at its Trenton plant because of delays caused by the State. The State has already conceded that it caused a delay in approval of shop drawings and that consequently fabrication for bridges 1, 2 and 4 had to be performed later than originally scheduled. In August, 1966, the State began to issue approved shop drawings, but American Bridge had already scheduled and committed itself to fabricate steel for other customers. The Trenton plant manager at this time, Moore, testified about the resulting problems of attempting to fulfill its regular orders plus the delayed Public Constructors' order. The evidence indicates that the total cost of fabrication relating to this item was $546,370. The State does not challenge this figure; it challenges only the award of 10% of this figure ($54,637) for the loss of efficiency at the Trenton plant due to State-caused delays. Moore's testimony revealed that there was substantial buildup at the Trenton plant prior to April, 1966 in anticipation of the start of Public Constructors' fabrication. Furthermore, in August, 1966, American Bridge had to make a number of adjustments in the Trenton plant in

order to handle the additional Public Constructors' work on top of its regular orders. The State's revision to the drawings also caused additional work at the Trenton plant. The five-to six-month delay resulted in the Trenton plant duplicating some of its work, and other inefficiencies resulted from the substantial delay in the commencement of fabrication for bridges 1, 2 and 4. Moore pointed out that it was necessary to put on extra crews because of the revised scheduling of the Public Constructors' steel fabrication. Moore estimated that 10% of the actual cost of fabricating the subject steel was a result of the delay and design revisions.

In our view, the record amply supports the 10% award, and "is sustainable in the absence of a mathematical basis for the computation of damages" (Westcott v State of New York, 264 App Div 463, 466, supra; see, also, Terry Contr. v State of New York, 42 AD2d 619; Rusciano Constr. Corp. v State of New York, 37 AD2d 745, mod 37 AD2d 789, supra).

Item (c) consists of an award of $54,883 for "Direct Costs for Redesign Work". The amount of this award was agreed to by the parties.

The awards under items (d), (e), (f) and (g) are based on the extra costs allegedly suffered by American Bridge at the construction site due to the State's delay and design problems. These awards include elements of excess costs of erection of bridge 3, which was fabricated in Elmira. The basis of the damages was increased costs in the field due to delays which caused erection to run for 43 weeks rather than the scheduled 17 weeks. Steel erection work at bridge 1 started on December 19, 1966 and was completed on March 29, 1967. The bolting and other detail work for bridge 1 was completed on April 14, 1967. American Bridge had planned on erecting bridges 1, 2 and 4 from June, 1966 through September, 1966, in approximately 17 weeks. The delays in approved shop drawings prevented this. The erection of bridge 2 began on March 27, 1967 and was completed on May 1, 1967. The construction of bridge 4 began on April 14, 1967 and was completed on June 19, 1967.

Bridge 3 was scheduled to be erected at the same time as bridges 1, 2 and 4 by a second American Bridge steel crew. The first phase of the erection of bridge 3 occurred from approximately June 20, 1966 until July 27, 1966. Between July 27, 1966 and August 12, 1966, American Bridge remained on the job site but could not do the detail work on bridge 3

due to design problems. The steel members between piers 3 and 8 of bridge 3 had been fabricated by American Bridge according to the planned specifications and State approved shop drawings. However, they did not fit. American Bridge discovered a relatively simple remedy for the problem. It took the State at least 10 days to approve this remedy and claimant's witness, Boring, testified that this decision could have been made in the field.

American Bridge moved off the job site on August 12, 1966 since there was nothing else they could do as they were awaiting decisions of the State for correcting design errors relating to the steel for bridge 3. As already pointed out, the steel for bridges 1, 2 and 4 had not even begun to be fabricated because of the design problems. Therefore, American Bridge had no alternative but to pull off the job site.

Finally, on November 14, 1966, American Bridge returned to the job site to erect bridge 1 and complete bridge 3. As of that date, the State had not approved a solution for the steel problem in span 2 of bridge 3, but American Bridge returned to set up its plant for the erection of span 9 of bridge 3. They entered spans 9 to 24 and then did the work on span 1 and span 2, both of which needed design revision. The actual erection of phase 2 of bridge 3 ran from November 28, 1966 to February 28, 1967. The steel work for bridge 3 was completed on March 24, 1967.

The State's design errors and delays in approving revisions and remedies to a variety of problems in regard to the bridges caused the steel work to be performed during the fall and winter rather than the summer. Because of the winter weather, American Bridge had difficulty receiving delivery of the steel at the construction site and incurred considerable loss of time in the storage, handling and movement of the steel. Job conditions were poor from November 14, 1966 to March 1, 1967 due to the cold and wet weather. The bad weather resulted in a significant loss of efficiency for American Bridge and extended the period of construction significantly beyond American Bridge's schedule. The evidence clearly showed that American Bridge could have performed much of the work at earlier times if the designs had been correct and the weather favorable.

The State argues that American Bridge's own scheduling at the fabricating stage contributed to moving the work into winter. This argument is unsupported by the facts surround-

ing fabrication at the Trenton plant. The awards under items 9 (d), (e) and (f) are affirmed.

Item (g) represents an award of $73,940.38 for costs of additional equipment required to be used because the erection of steel involved a 43-week rather than a 17-week period, and also because construction had to be extended into the winter. The State, as we see it, challenges the imposition of liability, but in our view the finding of liability is predicated on the same factors warranting the imposition of liability in relation to other items under cause of action nine. The State at trial objected to the use of associated equipment distribution rates rather than ownership rates, but since no evidence other than claimant's was offered at trial, and no objection is raised on appeal as to the damage computation formula employed by the trial court, the award is affirmed.

This brings us to the final item under the ninth cause of action, which was not designated by letter: an award of $55,495.99 as the additional cost for repairing welds. Some misunderstanding appears to have developed as the result of an incorrect specification appearing in the shop drawings as to the type of weld rod wire to be used. Thereafter, consultations ensued to decide whether L-60 wire or L-61 wire should be used. Finally, L-61 was chosen, which proved to be the wrong type, and extensive weld repairs were necessitated. The Court of Claims imposed liability on the State upon a finding that the State approved the use of L-61 wire.

This award must be reversed. Upon a review of the evidence, we find that the State did in fact suggest the use of L-60 wire, and that during the course of the consultations, claimant urged the use of L-61. The Court of Claims characterized the decision making process as a mix-up, but in our view the determinative factor is that the use of L-61 wire was undertaken at the claimant's initiative. Thus, even if the State can be charged with inadequate supervision for failing to prohibit the use of L-61—and we do not so find, but only assume this for the purposes of this discussion—liability cannot be imposed on the State for problems resulting from claimant's active role in bringing about the use of improper wire.

By way of recapitulation, we adjudge, on the law and the facts, with regard to every cause of action and items thereunder, as follows:

First cause of action, affirmed.

Second cause of action, affirmed as to item (c) "Borrow", and item (h) "Additional Cost of Materials for Bridge Construction"; reversed as to item (b) "Haul Road", and item (d) "Premium Time"; modified as to items (a) "Additional Cost of Excavation and Embankment", item (e) "Cost of Bridge Supervision", item (f) which is hereby modified to award "Cost of Supervision, Indirect Labor and Equipment After August 1, 1968", item (g) which is hereby modified to award "Cost of Field Expenses After August 1, 1968", item (i) "Additional Cost of Structure Excavation", and item (j) "Additional Cost of Trench and Culvert Excavation".

Third cause of action, modified, so as to award "Cost of Wage Rate Increases After August 1, 1968".

Fourth cause of action, modified, so as to award "Cost of Holiday Pay After August 1, 1968".

Fifth cause of action, modified, so as to award "Additional Amount for Maintenance and Protection of Traffic After August 1, 1968".

Sixth cause of action, affirmed.

Ninth cause of action, affirmed as to item (b) "Fabrication Loss of Efficiency", item (c) "Direct Cost for Redesign Work", item (d) "Stretch Out of Field Costs", item (e) "Additional Wage Rate Increases", item (f) "Direct Labor Effect Due to Loss of Efficiency", and item (g) "Additional Equipment Cost"; reversed as to item (a) "Loss of Fixed Plant Over-Head", and unlettered item "Additional Cost for Repairing Welds".

The judgment should be modified, on the law and the facts, so as to reduce the award on the second cause of action to $682,625.60; so as to reduce the award on the third cause of action to $1,553; so as to reduce the award on the fourth cause of action to $1,737; so as to reduce the award on the fifth cause of action to $312.50; so as to reduce the award on the ninth cause of action to $342,253.38; for a total award, inclusive of the second, third, fourth, fifth, sixth and ninth causes of action of $1,031,332.03, together with appropriate interest, and, as so modified, affirmed, without costs.

KOREMAN, P. J., SWEENEY, MAIN and LARKIN, JJ., concur.

Judgment modified, on the law and the facts, so as to reduce the award on the second cause of action to $682,625.60; so as to reduce the award on the third cause of action to $1,553; so as to reduce the award on the fourth cause of action to $1,737; so as to reduce the award on the fifth cause of action to

$312.50; so as to reduce the award on the ninth cause of action to $342,253.38; for a total award, inclusive of the second, third, fourth, fifth, sixth and ninth causes of action of $1,031,332.03, together with appropriate interest, and, as so modified, affirmed, without costs.